JAMES P. BENNETT, (SBN 65179)
JBennett@nortonlaw.com
GEORGE C. HARRIS, (SBN 11074)
GHarris@nortonlaw.com
MATTHEW OHLHEISER (SBN 342885)
MOhlheiser@nortonlaw.com
The NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900

*Attorneys for Plaintiff JOAQUIN CIRIA*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOAQUIN CIRIA<br><br>          Plaintiff,<br><br>          v.<br><br>CITY AND COUNTY OF SAN FRANCISCO;<br>SAN FRANCISCO POLICE DEPARTMENT;<br>ARTHUR GERRANS; JAMES CROWLEY;<br>NICOLAS J. RUBINO; DOES 1 – 20<br><br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983; STATE TORT CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Joaquin Ciria was wrongfully investigated, arrested, prosecuted, convicted, and imprisoned for more than 30 years for the murder of his childhood friend, Felix "Carlos" Bastarrica. Ciria has always maintained his innocence.

2.      Ciria was tried and convicted for Bastarrica's murder in San Francisco County Superior Court in 1991.  Ciria was convicted based on evidence fabricated and falsified by members of the San Francisco Police Department ("SFPD").  Specifically, SFPD inspectors Arthur Gerrans and James Crowley coerced a key witness (who knew, with certainty, that Ciria did not commit the murder) into implicating Ciria despite their knowledge of evidence that demonstrated Ciria's innocence. Simultaneously, the two inspectors facilitated and influenced multiple unreliable witness identifications in furtherance of their plan to pin Bastarrica's murder on Ciria.  Without the evidence coerced, fabricated, and influenced by Gerrans and Crowley, Ciria would not have lost nearly half of his life to wrongful incarceration.

3.      After decades of wrongful incarceration, Ciria received assistance from the Northern California Innocence Project and filed a habeas petition challenging the validity of his sentence on January 19, 2021.  The investigation that caused Ciria's conviction was so egregiously tainted that the San Francisco District Attorney, rather than opposing Ciria's petition, referred his case to the District Attorney's Innocence Commission and then admitted in its filings that Ciria was innocent and "was wrongfully convicted of first-degree murder" as the result of "incentivized false testimony." The District Attorney requested that the Superior Court set aside Ciria's conviction, release him from custody, and "find him factually innocent."  On April 18, 2022 – almost exactly 32 years after he was wrongfully arrested – the San Francisco County Superior Court vacated Ciria's conviction and sentence and dismissed all charges against him.  Ciria was released from prison on April 20, 2022.

4.      The suffering endured by Ciria during his decades of wrongful imprisonment is attributable solely to the actions and inaction of the City and County of San Francisco and its employees, including members of the SFPD.  As a result of the SFPD's fabrication of evidence and relentless pursuit of Ciria despite obvious evidence of his innocence, Ciria was denied the freedom to make his own living and build the life he was entitled to.  Defendants robbed Ciria of his fundamental rights to

life, liberty, and the pursuit of happiness.

5.     Ciria now brings this action to hold defendants accountable for their coordinated, reprehensible conduct under the color of law and seeks monetary relief for the unjustified deprivation of his most basic constitutional rights.

## PARTIES

6.     At all times pertinent hereto, prior to his wrongful incarceration, plaintiff Joaquin Ciria was a resident of the State of California and of the City of San Francisco.

7.     Defendant the City and County of San Francisco ("the City") is, and at all times alleged herein, was a municipal corporation and/or political subdivision organized and existing under the laws of the State of California.

8.     Defendant the San Francisco Police Department is, and at all times alleged herein was, an agency of the City.

9.     At all times relevant herein, defendant Arthur Gerrans was employed by and working on behalf of the SFPD and was a resident of the state of California.  Gerrans was a homicide inspector for the SFPD and played an active role in the investigation resulting in Ciria's prosecution and conviction. Gerrans is sued in his individual capacity and, upon information and belief, is indemnified by the City.

10.     At all times relevant herein, defendant James Crowley was employed by and working on behalf of the SFPD and was a resident of the state of California.  Crowley was a homicide inspector for the SFPD and played an active role in the investigation resulting in Ciria's prosecution and conviction. Crowley is sued in his individual capacity and, upon information and belief, is indemnified by the City.

11.     At all times relevant herein, defendant Nicolas J. Rubino was employed by and working on behalf of the SFPD and was a resident of the state of California.  Rubino was a police officer for the SFPD and played an active role in the investigation resulting in Ciria's prosecution and conviction. Rubino is sued in his individual capacity and, upon information and belief, is indemnified by the City.

12.     Does 1-20 are officers or employees of The City and County of San Francisco and the San Francisco Police Department whose identities are currently unknown to plaintiff, who participated in approved and/or ratified the violations of plaintiff's rights described herein.

13.     At all relevant times, all defendants were acting under the color of state law.

## JURISDICTION AND VENUE

14.     This is an action for the violation of civil rights arising under 42 U.S.C. §§ 1983 and 1988.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(4).

15.     This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over all defendants because, on information and belief, each defendant resides within the Northern District of California.  Further, all of the actions and omissions of defendants alleged in this complaint occurred in San Francisco, within this judicial district.

17.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1), because, on information and belief, all defendants reside in the Northern District of California.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims and the actual harm to Plaintiff occurred in this district.

18.     On September 19, 2022, Ciria timely presented his claim to the City in compliance with Cal. Gov't Code § 900 et seq.  The City denied liability for any of Ciria's claims in a letter dated November 1, 2022, and received by Ciria's attorneys on November 7, 2022.

## I.     FACTUAL ALLEGATIONS

### A.     The Murder of Felix "Carlos" Bastarrica and Initial Investigation

19.     On March 25, 1991, Felix "Carlos" Bastarrica, a childhood friend of Ciria, was shot and killed in Clara Alley, in San Francisco.   According to eyewitnesses and the San Francisco District Attorney's Innocence commission's investigation, it is likely that an individual named Candido Diaz killed Bastarrica.

20.     Soon after learning of the murder, Ciria heard rumors that the police considered him a suspect and voluntarily went to answer questions from two SFPD inspectors, defendants Gerrans and Crowley.  He told them that Bastarrica was his friend and that he was at home when Bastarrica was killed.

21.     Ciria explained to the inspectors that earlier in the evening he had been at an arcade with a man named George Varela.  Ciria told the inspectors that Varela had been driving them in his white Monte Carlo that night.  He also explained that, after leaving the arcade, he and Varela went to an

establishment called Galan's Bar for approximately ten minutes but left shortly after Ciria got into an altercation with an individual named Roberto Hernandez.   He told the inspectors that Varela dropped him off at his home at around 8:25 p.m., prior to the time Bastarrica was murdered, and that he remained home for the rest of the evening.

22.     Attempting to further assist Gerrans and Crowley, Ciria offered additional information, including a description of Varela and the Monte Carlo as well as Varela's address and personal information.  Gerrans and Crowley had learned that the shooter had arrived at and fled the crime scene in a white Monte Carlo prior to speaking with Ciria, and as a result of the information offered by Ciria, the inspectors soon found and interviewed Varela.

**B.     Gerrans and Crowley Fabricate a Case Against Ciria and Coerce False Statements from Varela**

23.     Ciria's attempts to assist the inspectors were met with unjustified, malicious reprisal that would rob Ciria of more than half of his life to date.  Early in the investigation – and with no physical or other evidence linking Ciria to the crime – Gerrans and Crowley decided to pin the murder on Ciria. Gerrans and Crowley concocted their plan, in part, from unsubstantiated rumors spread by the real killer, Candido Diaz, who they failed to meaningfully investigate for the Bastarrica murder.

24.     To accomplish their objective, Gerrans and Crowley targeted the then 18-year-old and drug-addicted George Varela as their star witness.  During his very first interview with the inspectors, Gerrans and Crowley repeatedly threatened and pressured Varela into implicating Ciria, despite the fact that Varela initially corroborated Ciria's statement that he was at home at the time of the killing.

25.     During this April 17 police interview, Varela initially lied to the inspectors stating that he was not present for the murder (he was) but confirmed the truthful statements Ciria had given the inspectors about his own whereabouts on the night of the murder.  Varela told them that he had been driving his white Monte Carlo with Ciria earlier in the evening.  He repeatedly offered to explain to the inspectors how long he was with Ciria, reiterating that he knew the "length of time" he was with Ciria and recalled the time they had "split up."   He explained that, earlier in the evening, he and Ciria were at an arcade, and that afterwards he drove Ciria home. Varela initially claimed he went home and stayed there after dropping off Ciria, but then he admitted that he "probably went somewhere" that evening.

26.     Rather than following up on where Varela went after he dropped off Ciria, or who he was with, Gerrans and Crowley instead began pressing their unsupported version of the murder – with Ciria as the killer – on Varela. The inspectors threatened Varela with a murder charge if he did not fall into line.  During the audio-recorded interview, the inspectors ignored the consistent, exonerating information about Ciria on the night in question and instead coerced Varela into adopting their baseless narrative.

27.     Gerrans and Crowley told Varela that they knew that Ciria had shot and killed Bastarrica and that Ciria had arrived at and fled the scene of the murder in Varela's white Monte Carlo.  They threatened to charge Varela with the murder and emphasized that he would be in trouble if he continued to "lie and cover up for Joaquin [Ciria]."  The threats were severe and direct – for example, the inspectors told Varela that they understood he had gotten "into a situation" and said, "we know you didn't do it.  But if you're going to continue to sit in here and lie and cover up for Joaquin [Ciria], you're going to be in some deep shit . . . . you're only 18 years old, you've been in shit as a juvenile, you don't want to get in shit as an adult . . . ."

28.     It was only after the inspectors began making these threats to Varela that he implicated Ciria in the murder.  In fact, prior to these threats, Varela had not identified any individual as the shooter.  Once the inspectors began pressing their fabricated story that Ciria was the murderer, Varela responded only with phrases like "Hey, whatever you said" and "Okay, just like you said" in affirming their story.  As the interview progressed, Varela offered a generic description of the shooting without using any names, then, after further pressure from the inspectors, agreed that Ciria was the shooter.  The inspectors also suggested to Varela that he say he did not know the shooting was going to occur, which Varela adopted as true.

29.     The improper, coercive conduct of Gerrans and Crowley is the only reason Varela implicated Ciria, and the inspectors had good reason to know Ciria was innocent.  Indeed, prior to the inspectors' pressure and threats of murder charges, Varela repeatedly offered information about Ciria's whereabouts that was consistent with Ciria's innocence and Ciria's own account of the evening.  Nevertheless, Gerrans and Crowley fabricated, coerced, and documented false evidence, submitting the same for review and representing their file as truthful to prosecutors.

30.     Largely based on Varela's coerced statements and other fabricated evidence offered by inspectors Gerrans and Crowley, Ciria was arrested less than a month later on April 19, 1990, and charged with first degree murder.  Ciria was 29 years old at the time of his arrest.  Ciria pled not guilty and maintained his innocence as he had from the start.

### C.     Gerrans and Crowley Influence and Facilitate Suggestive, Unreliable Witness Identifications

31.     Gerrans and Crowley did not limit their coercion and fabrication to Varela's statements. Rather, to bolster their case and frame Ciria, the inspectors repeatedly facilitated and influenced unreliable witness identifications to further implicate Ciria.  In doing so, Gerrans and Crowley ignored obvious discrepancies between eyewitness descriptions of the shooter and consistent testimony from multiple witnesses about Ciria's appearance on the night of the murder.

32.     First, Kenneth Duff, who witnessed the shooting from a car in the alley where it occurred, reported that he only saw the killer's face for "a split second" from approximately 60-100 feet away in a dark alley.  He initially described the suspect as "Hindu," only changing his mind after Gerrans and Crowley showed him photographs and suggested that the real killer could have been Black.

33.     Duff reported that he had never seen the shooter before and that he did not think he would be able to identify the shooter from a photo.  Nevertheless, on April 5, 1990, the inspectors gave Duff a photo lineup that included a picture of Ciria.  Duff did not identify anyone in the photo lineup as the shooter.

34.     Undeterred, Gerrans and Crowley then provided Duff another photograph – this time of a live lineup that Duff had not attended – that again included Ciria.  Duff did not identify Ciria as the shooter, but suggested that he was someone who "looks like" the shooter.  Though this interview was recorded, Gerrans and Crowley did not turn on the recording device until after Duff had apparently suggested Ciria looked like the shooter, potentially as the result of additional coaching and suggestion from the inspectors.

35.     Duff did not positively identify Ciria as the shooter at any time prior to trial, at which time Ciria was at the defense table in a red corrections jumpsuit, and after the inspectors had repeatedly shown Duff his photograph and made suggestions as to the killer's appearance.

36.     Second, Kathleen Guevara witnessed the shooting from a second-story window overlooking the alley.  Guevara told investigators that she only saw the shooter as a "silhouette" and that she recalled seeing a silhouette of the left side of the shooter's head.  She made clear that she never saw the shooter's face, instead giving vague descriptions of the shooter's "hairline" and general build.

37.     The night of the shooting, she told inspectors that she would "maybe" be able to identify the shooter.  The inspectors presented her with a photographic line-up three days later and instructed her "to see which one looked closest to the murderer," but did not record the identification procedure.  Guevara did not positively identify Ciria, instead suggesting that Ciria looked "most like" the suspect, stating she was 80% sure and writing "possibly" under Ciria in the photo line-up.

38.     Like Duff, Guevara never provided a positive identification of Ciria until trial, when Ciria was sitting at the defense table in a red corrections jumpsuit.

**D.     Gerrans and Crowley Ignored Obvious Discrepancies Between Ciria and Witness Descriptions of the Killer**

39.     Beyond improperly instructing eyewitnesses during line-ups and priming witnesses to identify Ciria at trial, Gerrans and Crowley ignored obvious evidence distinguishing Ciria's appearance from that of the murderer on the night in question.

40.     For example, both Duff and Guevara reported that the shooter was wearing a long trench coat and was wearing his hair in an afro.  Guevara testified that the shooter's most distinguishing feature was his hairline, which she recalled to be an afro-style haircut, which she observed only in silhouette.  In contrast, multiple witnesses, including Varela (the prosecution's star trial witness), testified at trial that Ciria had his hair in a brushed-down, greasy, Jeri curl, and that Ciria typically wore his hair in this fashion around the time of the murder.  Roberto Hernandez, who got into an altercation with Ciria at Galan's Bar on the night of the murder (and had no reason to lie for Ciria) specifically described Ciria's greasy hairstyle on the night of their altercation, which looked markedly different from the afro-style hair Duff and Guevara described in relation to the killer.

41.     Other witnesses testified (or would have testified, if called) that Ciria was wearing a short black and red jacket with prominent white lettering on that night, not a long dark trench coat.

42.     Through these identifications, Gerrans and Crowley, and despite obvious discrepancies

between Ciria's appearance and that of the murderer, continued to pressure and manipulate witnesses into implicating Ciria. As the San Francisco District Attorney's Innocence Commission later found, a review of the evidence collected makes clear that the descriptions of the killer provided by eyewitnesses simply did not match Ciria based on the information available to Gerrans and Crowley.

### E. Gerrans and Crowley Willfully Ignore Undisputed Evidence Demonstrating Ciria's Innocence

43. Inspectors Gerrans and Crowley did not just fabricate a story designed to pin the Bastarrica murder on Ciria. They ignored reliable, consistent evidence demonstrating Ciria's innocence throughout their investigation in favor of their false, planted narrative.

#### 1. Undisputed Alibi Evidence

44. As stated above, both Varela and Ciria told the inspectors that Ciria returned home around 8:25 p.m. on March 25, which was before the time of the murder. While those statements alone tend to demonstrate Ciria's innocence, Gerrans and Crowley collected undisputed evidence that further confirmed Ciria's alibi.

45. The inspectors interviewed Yojana Paiz and Marina Flores, who were at home with Ciria that night and willingly spoke with the inspectors. Gerrans and Crowley conducted these interviews in English, despite repeated indications from both women that they only spoke Spanish and did not understand the questions being asked in English.

46. Nevertheless, Paiz and Flores confirmed the timing of Ciria's arrival at home on March 25, as reported by Ciria and Varela. Specifically, Paiz and Flores each confirmed that Ciria had gone out with Varela around 7:00 p.m. and returned home around 8:00 or 8:30 p.m. For three decades, these women have maintained that Ciria was at home with them and his newborn son at the time of the murder. Gerrans and Crowley ignored this evidence, instead continuing their pursuit of Ciria based on coerced, false testimony and manufactured witness identifications. Neither witness was called at trial.

#### 2. SFPD Surveillance Intelligence Corroborated Ciria's Alibi

47. In addition to the statements of Ciria, Varela, Paiz, and Flores, on information and belief, the SFPD (including Gerrans, Crowley, and defendant Rubino) possessed surveillance information at the time of the investigation confirming that Ciria did not kill Bastarrica.

48.     As early as 1989, Ciria was being surveilled by SFPD officers.  In December of that year, Ciria was arrested by undercover police officers and questioned about drugs and contraband discovered in a hotel, which Ciria knew nothing about.  Nevertheless, Rubino told Ciria before releasing him that they would "get him sooner or later."

49.     When Ciria returned to his car after being released from a holding cell, he discovered several items were missing from his vehicle – including a collection of personal photographs, a phonebook, and Ciria's beeper.  Following that baseless arrest, Ciria repeatedly noticed undercover officers, including Rubino, following him and surveilling his house at 159 Sickles Street in San Francisco from vehicles parked across the street.  The surveillance became so frequent and harassing that Ciria traded in his beloved red firebird for a Mitsubishi truck in hopes that the surveillance would end.

50.     It did not.  And in fact, on the evening of March 25, 1990, after being dropped at home by Varela, Ciria observed a surveillance vehicle parked kitty-corner from his home.  The officers observing Ciria that night had indisputable evidence of Ciria's innocence as they observed him at home while Bastarrica was murdered miles away.

51.     Despite this surveillance information, Rubino himself arrested Ciria for the murder of Bastarrica on April 19, 1990, using an undercover vehicle.  After Officer Rubino arrested Ciria, Ciria pleaded with Rubino that he must have known he did not kill Bastarrica because Rubino had been surveilling him and knew he was at home on the night of the murder.  Rubino affirmed Ciria's statement and confirmed that he had been surveilling Ciria, including on the day after the shooting.

52.     After this discussion, an officer in a marked car transported Ciria to be interviewed by Gerrans and Crowley.  Rubino filed an unremarkable police report, describing an arrest without incident and without noting surveillance of Ciria.

53.     On this basis, and on information and belief, the SFPD, including Officers Gerrans, Crowley, and Rubino, ignored, suppressed, and concealed indisputable evidence that Ciria was at home on the evening of March 25, 1990 and had nothing to do with the murder of Bastarrica.  The SFPD was aware of this evidence but intentionally and willfully failed to disclose it to Ciria and/or the District Attorney's office during or prior to Ciria's trial.

**F.     Ciria Is Convicted Because of Evidence Fabricated By Gerrans and Crowley.**

54.     At trial, Ciria was convicted based on the fabricated, coerced, and incentivized testimony of Varela and the two eyewitnesses.  SFPD employees, including inspectors Gerrans and Crowley, caused this prosecution, knowingly presenting a case built on lies and manipulation to the District Attorney's office.  Elements of the testimony presented at trial – as measured against facts known by Gerrans and Crowley – further underscore the extent of their malicious fabrication of evidence against Ciria.

**1.     Varela Offered False, Coerced, and Incentivized Testimony at Trial.**

55.     Varela, having been coerced by Gerrans and Crowley to falsely implicate Ciria in the murder, served as the prosecution's star witness at trial.  At trial, he offered self-serving, false testimony to protect himself from the inspectors' improper threats.  He recited a narrative imposed on him by police, which the state bolstered with unreliable, unduly influenced witness identifications from Duff and Guevara, but which at times directly contradicted the testimony of the eyewitnesses to the murder.

56.     At trial, Varela offered a false narrative of the timeline of the evening of the murder that contradicted his initial statements to police made before he was threatened with murder charges against him.

57.     For example, Varela testified that he had initially lied to inspectors about the events of the murder, but had changed his story when he was informed that there were eyewitnesses to the crime.  He testified that on the day of the murder he drove Ciria to Galen's bar, but that they left a few minutes later, at which time Ciria gave Varela directions about where to go.  Varela further testified that  Ciria eventually pointed out a man carrying a white plastic bag and instructed Varela to pull into an alley.  Varela described an argument between Ciria and the individual in the alley, adding that the victim seemed to be pleading with Ciria, calling out "Joaquin, Joaquin, Joaquin" multiple times.  According to Varela, Ciria eventually pulled a gun out of his pocket and shot the victim three times, firing one initial shot and two more after the victim attempted to flee.

58.     Varela has since admitted that he gave false testimony implicating Ciria as the result of extreme police pressure.  Even setting aside those admissions, critical elements of Varela's story – the story concocted by Gerrans and Crowley – were plainly contradicted by the testimony and observations

of Duff and Guevara, facts known to Gerrans and Crowley during the investigation.

59.     For example, Varela testified that the victim had shouted Ciria's name repeatedly – "Joaquin, Joaquin, Joaquin" – loudly at least five times.  Yet both independent witnesses who saw and heard the men yelling testified that they did not hear the victim yell "Joaquin" at all.  Varela – who was well aware that Candido Diaz, not Ciria, committed the murder – fabricated this testimony as the result of immense pressure from Gerrans and Crowley to pin the crime on Ciria.

60.     As a result, Ciria was convicted based on a false, fabricated narrative developed by Gerrans and Crowley despite reliable information collected during their investigation tending to prove Ciria's innocence.

### 2.     The SFPD and District Attorney Incentivized Trial Witnesses to Provide Inaccurate Testimony Against Ciria.

61.     The SFPD, including Gerrans and Crowley, provided at least Varela and Guevara with overt and improper benefits for their false and unduly influenced testimony against Ciria at trial.

62.     First, Varela received multiple benefits, including repeated leniency from the District Attorney's office, in exchange for his testimony against Ciria.  For example, on at least three occasions between August and November of 1990, Varela signed promises to appear relating to court dates and probation requirements, punishable by imprisonment or fines as high as $10,000.  Varela failed to appear for any of these related obligations but did not face imprisonment or fines or any consequence.

63.     Similarly, Varela was cited or arrested at least six times between June of 1990 and November of 1990 for violations ranging from public intoxication to felony drug possession and possession of a stolen vehicle.  Several of the related charges were simply dismissed, while an arrest relating to multiple firearms was resolved with a guilty plea to only misdemeanor charges, resulting in probation and a suspended sentence.

64.     Finally, the SFPD provided Varela with cost-free housing in a beach-side hotel and in Daly City for his testimony against Ciria.

65.     Guevara received a more straight-forward incentive that was never disclosed to the defense at trial.  The San Francisco District Attorney's Innocence Commission determined that Guevara received a payment of $10,000 for her testimony after the conclusion of the trial.  The fact of this payment (or any agreement to testify with an understanding of payment) was not disclosed to the

defense, or potentially to the prosecution, at any time.

66.     Each of these benefits – intended to secure testimony against Ciria – was improper and further underscores the depths of the SFPD's efforts to secure a conviction against Ciria, regardless of the facts collected during the investigation that strongly suggested Ciria's innocence.

### G.     The San Francisco District Attorney's Office Has Admitted Ciria's Innocence and that the SFPD Used Threats and Rewards to Manufacture Evidence Against Him.

67.     In light of the egregious police misconduct responsible for Ciria's conviction, and the habeas corpus efforts of Ciria and his attorneys at the Northern California Innocence Project, the San Francisco District Attorney's Innocence Commission first considered Ciria's case in October of 2020.

68.     The Innocence Commission was formed in 2020 and "exists to further the DA's Mission to be a 'minister of justice,'" ensuring that "'special precautions are taken to prevent and rectify the conviction of innocent persons'" in San Francisco.[1]  After accepting Ciria's case for review, the Innocence Commission began a four-month investigation into his case starting in November of 2020, including witness interviews, document review, and analysis of Ciria's draft habeas corpus petition provided to the Commission in the fall of 2020.

69.     In March of 2021, the Commission determined that Ciria was entitled to relief and that his conviction was "not credible."

70.     Ciria filed his habeas corpus petition on January 19, 2021.  In response, the San Francisco County Superior Court issued an Order to Show Cause on April 11, 2021, stating, "the Court issues the Order to Show Cause as to why Petitioner should not have his judgment of conviction vacated and be unconditionally released pursuant to the actual innocence claim based on false testimony presented at trial."  In April of 2021, the Innocence Commission submitted its Findings of Fact and Conclusions of Law Memorandum to the District Attorney, copying the Managing District Attorney and Innocence Commission Member Arcelia Hurtado.

71.     The District Attorney's office, led by Arcelia Hurtado, reviewed the findings of fact and conclusions of law and submitted a "Return to Petition for Writ of Habeas Corpus" on June 9, 2021.[2]

---

[1] Supplemental Return and Memorandum of Points and Authorities in Support of Supplemental Return filed by the San Francisco District Attorney on October 1, 2021, attached as Exhibit A at 46.
[2] Attached to this Complaint as Exhibit B.

That filing acknowledged the findings of the Innocence Commission and requested that the Court "set aside Joaquin Ciria's February 20, 1991 conviction, order his immediate release from custody, and find him factually innocent."

72.     On October 1, 2021, at the Court's direction, the District Attorney filed a Supplemental Return in the same Court, addressing Ciria's factual allegations relating to the false testimony given at trial and evidence discovered following the trial.  In the two returns, the District Attorney's office admitted the following facts, which demonstrate that the investigation of Ciria involved witness intimidation, unreliable investigation tactics, and a failure of the justice system:

a)  Ciria is innocent and spent over 30 years incarcerated for a crime he did not commit;

b)  The State's primary witness provided material, false testimony;

c)  There was no physical evidence linking Ciria to the murder;

d)  It is undisputed that Varela implicated Ciria only after he was threatened with murder charges if he continued to "lie and cover up for" Ciria;

e)  It is undisputed that Varela's testimony against Ciria was self-serving, incentivized, and rewarded;

f)  Varela has admitted to two different individuals since trial that Ciria was not the shooter and that he implicated Ciria as the result of pressure from the police and their focus on Ciria as the prime suspect;

g)  Varela's admissions to perjuring himself are contrary to his interest and credible;

h)  The justice system failed Ciria in various ways, all of which contributed to his wrongful conviction;

i)  Ciria's conviction was the product of false, incentivized testimony and unreliable, cross-racial eyewitness identifications made by strangers who saw the shooting in a dark alley, from a distance;

j)   Neither Duff nor Guevara made a positive identification of Ciria until they testified in court, pointing to Ciria at the defense table in a prison jumpsuit;

k)   The homicide inspectors in Ciria's case focused exclusively on Ciria as their sole suspect based on rumors spread by the actual killer, Candido Diaz;

l)   Diaz, the real killer, more closely matched the description of the killer provided by eyewitnesses, including because Ciria was wearing a Jeri curl and a short black and red jacket while eyewitnesses described a man with an afro and a trench coat, known characteristics of Diaz around the time of the killing;

m)  That inspectors Gerrans and Crowley should have retained a translator to interview Yojana Paiz and Marina Flores, Spanish-speaking alibi witnesses for Ciria who were interviewed in English, despite indications that the women struggled to understand the inspectors during the interview;[1]

n)   Following the trial, another eyewitness, Roberto Soccoro, has told multiple attorneys, investigators, and members of the San Francisco District Attorney's Innocence Commission, and sworn under penalty of perjury, that he witnessed Bastarrica's murder and that the real killer is Candido Diaz.

73.     The City's own admission of these facts confirms what Ciria spent decades trying to prove while incarcerated – his conviction was a sham, supported only by the fabricated and false evidence developed and presented to prosecutors by Gerrans and Crowley, and in spite of reliable, exculpatory evidence concealed, withheld, and destroyed by Gerrans, Crowley, and Rubino.

**H.     During the Period of the SFPD's Investigation of Ciria, the SFPD Maintained Unconstitutional Patterns and Practices of Fabricating Evidence and Witness Identifications and Withholding Exculpatory Evidence.**

74.     Ciria's conviction was the direct result of the City and the SFPD's unconstitutional

---

[1] This fact is set out in the People's "Statement of the Facts" in the Supplemental Return to Ciria's Writ of Habeas Corpus.  Exhibit A at 40, n. 10.

investigative policies, practices, and customs, as well as the SFPD's failure to train or intervene to prevent constitutional violations flowing from these policies, practices, and fundamental omissions.  To the extent the SFPD failed to maintain policies encompassing constitutional violations alleged herein, the City and the SFPD failed to implement remedial measures sufficient to address or curb likely constitutional violations that would stem from tainted, reckless, and unconstitutional investigation and interrogation techniques.

75.     For example, there is substantial evidence that around the time of the investigation into Ciria, the SFPD, including but not limited to inspectors Gerrans and Crowley, repeatedly used improper, overly-suggestive identification techniques and fabricated witness testimony through threats and coercion to cause the wrongful prosecution of Black men in San Francisco.  For example, at least five Black men (including Ciria) were falsely convicted of murders that occurred between 1990 and 1991 in San Francisco based on fabricated evidence, unconstitutionally influenced witness identification, and/or improperly incentivized evidence offered by San Francisco Police Department officers and inspectors.[1] Including Ciria's conviction, these policies and practices resulted in nearly 100 years of collective wrongful imprisonment stemming from convictions in those two years alone.

76.     Just three months after inspectors Gerrans and Crowley began targeting Ciria, they participated in the fabrication of a murder case against Maurice Caldwell, a Black man from San Francisco, by (as alleged by Caldwell) assisting in the manipulation of witness identifications and pressuring witnesses into providing false testimony, despite reliable evidence of innocence.  (*See Caldwell v. City and County of San Francisco*, et al., N.D. Cal. No. 12-cv-1892-EDL).  The star witness in that case, like Varela, received various rewards for her testimony, including cash, employment, and a vacation.  Like Ciria, Caldwell's sentence was vacated  and he was released from prison on a successful habeas petition..

77.     Other cases contemporaneous to Ciria's, like those of John Tennison, Antoine Goff, and Caramad Conley, involved similar, unconstitutional police tactics, including undisclosed incentives provided to witnesses for testimony, the coercion of young, impressionable witnesses, manufactured

---

[1] The other exonerees include John Tennison, Antoine Goff, Caramad Conley, and Marurice Caldwell.

witness identifications, and the withholding of exculpatory and witness impeachment material.

78.     On information and belief, the policies and practices employed to secure wrongful convictions through fabricated evidence and identifications by SFPD officers, beyond those cases referenced herein, also mirror those used against Ciria: the use of threats and coercion against witnesses, repeated, suggestive assertions of a suspect's guilt, the leveraging of vulnerabilities or weaknesses of individual witnesses, the threat of criminal penalties for failure to comply, aggressive badgering of witnesses to elicit agreement or acceptance of suggested narratives, and the use of false statements in reports and investigation materials.

79.     To the extent the SFPD did not maintain explicit policies encompassing these unconstitutional tactics, these tactics presented an obvious risk of constitutional violations in response to which the City and the SFPD failed to take any remedial measures or institute any policy sufficient to address the risk of repeated constitutional violations.  The SFPD and City repeatedly caused the wrongful convictions of Black men – for murder – using unsound, unconstitutional, and coercive investigatory tactics and techniques over the course of just two years in 1990 and 1991.  Upon information and belief, and subject to further investigation and discovery, there are additional instances of similar tactics either embraced or deliberately ignored by the SPFD and the City during at least the 1980s and 1990s that led to unjustified convictions of racial minorities in San Francisco.

80.     Further, the City and the SFPD systematically failed to supervise, train, or otherwise intervene to discipline officers engaging in this conduct or to otherwise address   constitutional violations stemming from these practices and policies.  On information and belief, the City had notice of these unconstitutional patterns and practices through the open and notorious nature of the conduct among officers within the SFPD, citizen complaints, judicial decisions, and the willful acquiescence of SFPD supervisors.  The City and the SFPD were aware that their tactics had led to multiple wrongful convictions, especially because of obvious, reliable exculpatory evidence collected in cases like Ciria's.  Despite such evidence, and obvious reg flags in officer conduct (like that of Gerrans, Crowley, and Rubino), the City and the SFPD failed to implement sufficient policies, remedial measures, trainings, or disciplinary proceedings sufficient to curb the threat of serious, repeated due process violations against citizens of San Francisco.

81.     The SFPD also maintained a practice of manufacturing unreliable suspect identifications, similar to those obtained against Ciria, including by repeatedly suggesting that witness make less-than-certain identifications (i.e., requesting witnesses identify a suspect who looks "most like" the suspect they witnessed), selectively recording only portions of interviews or line-up sessions to highlight unduly influenced (and unreliable) witness identifications, falsely reporting or documenting witness identifications that did not meet minimum constitutional standards, and priming witnesses to identify specific suspects through repeated photographic or live exposures to the suspect.

82.     Worse yet, the SFPD maintained a "Secret Witness Program" during the time in which Ciria was under investigation for murder, which provided undisclosed cash and other incentives for witness testimony and identifications.  On information and belief, at least Varela and Guevara received compensation through the Secret Witness Program that was never disclosed to the prosecuting attorney or the defense in Ciria's case.  To be sure, the fact of the SFPD's use of the Secret Witness Program, which was designed to keep information about witness compensation from prosecuting attorneys and criminal defendants alike, has been established in connection with at least two other § 1983 claims for wrongful convictions in this District.  (*See generally Tennison v. City and County of San Francisco*, N.D. Cal. No. C 04-0574-CW (Consolidated cases of John Tennison and Antoine Goff).)

83.     This policy and program for covert witness payments virtually ensured a constitutional violation, and the SFPD had a policy of withholding information about witness incentives even from prosecutors, ensuring that the information never reached criminal defendants.  At the very least, these policies and practices disregarded the substantial risk that prosecuting attorneys would never learn of witness protection payments made in their cases and would therefore fail to disclose those payments to criminal defendants.  By 1990 and 1991, it was obvious to the SFPD and City that failing to disclose witness protection payments to criminal defendants violated prosecutors' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. The SFPD and City therefore had a constitutional responsibility to ensure that it had adequate policies and procedures to ensure that such payments were disclosed in every case and that officers were trained on their obligations.  Instead, the SFPD developed and maintained a program specifically designed to provide clandestine, undisclosed rewards and incentives to witnesses, virtually ensuring a pattern and

practice of *Brady* and *Giglio* violations in criminal investigations.

84.     As with other police tactics alleged, the SFPD and City routinely failed to discipline or train officers to prevent the constitutional violations associated with the improper incentivization of testimony.  These tactics were routine within the SFPD, including as evidenced by and alleged in civil rights cases of men from San Francisco wrongly pursued and convicted in this same period – including John Tennison, Antoine Goff, Carmad Conley, and Maurice Caldwell.  In the face of these obvious, repeated constitutional violations and policies and practices which facilitated these violations, the failure of the SFPD and City to properly train, supervise, or discipline officers amounted to a deliberate indifference to the rights of those who came into contact with the SFPD.

85.     These policies and practices of the SFPD and the City, and the failure to supervise, train, or otherwise intervene, permitted the tactics described above to be used in the investigation and conviction of Ciria.  In this way, the unconstitutional policies and practices of the SFPD and the City were a moving force behind Ciria's wrongful imprisonment.

86.     As a direct result of defendants' actions and omissions, which were willful, wanton, reckless, and/or performed with deliberate indifference to Ciria's rights, Ciria sustained injuries and damages, which are ongoing and will continue into the future, including: the loss of more than 30 years of freedom; physical pain and suffering; severe emotional and mental anguish and distress; loss of property; loss of family relationships; loss of income and career opportunities; legal expenses; humiliation; severe reputational damage; and the loss of enjoyment of life, including personal fulfillment, romantic relationships, career opportunities, and personal growth and development.  The SFPD and City robbed Ciria of his fundamental rights to life, liberty, and the pursuit of happiness for more than half of his life.

### **FIRST CLAIM FOR RELIEF**

**Deprivation of Civil Rights under 42 U.S.C. § 1983 –**

(**FABRICATION OF EVIDENCE**)

**(Against All Defendants)**

87.     Plaintiff realleges all preceding paragraphs as though set out in full herein.

88.     At all times relevant to this case, defendants had an obligation to comply with the due-

process requirements set forth in the Fifth and Fourteenth Amendments to the United States Constitution.  Defendants failed to meet these due process obligations with respect to Ciria.

89.     Defendants Crowley and Gerrans while acting in concert and under the color of law, deprived Plaintiff of his civil rights, particularly his right to due process of law, by fabricating, manipulating, coercing, concealing, and misrepresenting evidence during the investigation and prosecution of  Ciria.

90.     As detailed in this Complaint, defendants deliberately fabricated and manipulated evidence against Ciria in the following ways:

a.  By targeting Ciria despite the fact that they knew or should have known he was innocent on the basis of exonerating evidence Gerrans and Crowley discovered during the course of their investigation and the lack of any physical or positive evidence connecting Ciria to the crime;

b.  By focusing their investigation solely on Ciria despite the lack of evidence supporting his guilt and evidence pointing to other suspects, including but not limited to eyewitness descriptions of the killer that were materially different from Ciria's appearance at the time of the murder;

c.  By manipulating and coercing Varela, an 18-year-old with a drug problem, to adopt a false narrative implicating Ciria, despite Varela's own knowledge of Ciria's innocence, including by using explicit threats, coercion, and abuse and other tactics virtually certain to produce false, unreliable testimony;

d.  By using interview and investigation techniques with witnesses that were so coercive and abusive that defendants knew or should have known that those techniques would yield false information, including false statements and witness identifications;

e.  By providing false and fabricated information in case files and presenting such evidence as valid to prosecutors causing the wrongful prosecution and conviction of Ciria;

f.  By using obviously suggestive tactics to obtain witness identifications of Ciria,

despite obvious discrepancies between the eyewitness descriptions of the killer against witness descriptions of Ciria on the night in question;

    g.   By causing the presentation of false evidence at Ciria's trial, including Varela's testimony and the witness identifications of Duff and Guevarra;

    h.   By improperly incentivizing witnesses, including Varela and Guevarra, to provide false or unreliable testimony against Ciria.

91.   Had Gerrans and Crowley refrained from presenting fabricated evidence, Ciria more likely than not would not have been convicted of any crime and would not have served any period of incarceration.

92.   The conduct of these defendants was intended to cause harm to Ciria, and further, was intended to deprive him of his constitutional rights.  The acts and omissions taken by these defendants and each of them in fabricating evidence against Ciria were a cause of Ciria's criminal conviction and sentence of incarceration.

93.   Each defendant was acting in his or her capacity as an employee or agent of the City and the SFPD at all times pertinent hereto.  Further, the City and the SFPD violated their own obligations relating to Ciria's constitutional rights as an individual interacting with these entities.  Specifically, the City and the SFPD had a duty to Ciria and those similarly situated to establish, implement, and follow policies, procedures, practices, and customs which prevented the infringement of Ciria's and others' constitutional rights.  Further, these defendants had a duty to adequately train, supervise, and monitor their employees and agents to prevent the infringement of Ciria's and others' constitutional rights. Defendants and high-ranking officials employed by defendants or working on their behalf or as an agent of any defendant also had a duty to refrain from ratifying, or failing to act in the face of, constitutional violations effected by their employees or subordinates.

94.   The City and the SFPD, however, failed to prevent or redress Ciria's constitutional injuries in the following ways:

    a.   By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from the SFPD officers fabricating evidence (including unreliable or manufactured eyewitness

identifications) by coercing and pressuring witness to implicate Black men and people of color in San Francisco around the time period that Ciria was investigated, prosecuted, and convicted;

    b. By failing to adequately train, supervise, and/or discipline the SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the fabrication of evidence, particularly against racial minorities in San Francisco, to the degree that such failure amounted to a deliberate indifference in the face of inadequacies likely to lead to repeated constitutional violations;

95. The failure of these entity defendants is underscored by the number of Black men in San Francisco who suffered a similar fate to that of Ciria as the result of unconstitutional practices, policies, and/or inactions between at least 1985 and 1995.

96. The conduct of the City and the SFPD, including but not limited to their failure to maintain policies sufficient to prevent or failure to adequately train officers to prevent the repeated fabrication of evidence, was a moving force behind the constitutional violations suffered by Ciria and other Black men in the time period of Ciria's investigation, prosecution, and conviction.

97. Further, the City and the SFPD's inaction and deliberate indifference relating to the SFPD's fabrication of evidence, including in the face of multiple wrongful convictions of Black men stemming from these unconstitutional practices between at least (and not limited to) 1985 and 1995, were the moving force behind the egregious violations of Ciria' constitutional rights.

98. As a result defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages. Ciria was also deprived of familial relationships and companionship and lost past and future earnings in an amount to be determined at trial.

99. The misconduct of the individual defendants described in this claim was objectively unreasonable, wanton, reckless, malicious, and undertaken with deliberate indifference to Ciria's constitutional rights, and Ciria seeks punitive damages against the individual defendants.

100. Ciria further seeks costs and reasonable attorneys' fees against defendants, and each of

them, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law.

## SECOND CLAIM FOR RELIEF

**Deprivation of Civil Rights Against Individual Defendants Under 42 U.S.C. § 1983**

**(Withholding Exculpatory/Impeachment Evidence)**

**(Against All Defendants)**

101.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

102.    At all times relevant to this case, defendants had an obligation to comply with the due-process requirements set forth in the Fifth and Fourteenth Amendments to the United States Constitution.  Defendants failed to meet these due process obligations with respect to Ciria.

103.    Defendants Gerrans, Crowley, and Rubino deprived Ciria of his right to a fair trial by withholding exculpatory material and impeachment evidence from Ciria and prosecuting attorneys in violation of Brady v. Maryland, 373 U.S. 83 (1963) and its progeny and the Fourteenth Amendment to the United States Constitution.

104.     Defendants Gerrans, Crowley, and Rubino directly participated in or knew about the fabrication of false evidence and the concealment of exculpatory evidence described in this complaint and intentionally prevented the disclosure of that exculpatory information to Ciria, and on information and belief, to the prosecuting attorneys.  Gerrans, Crowley, and Rubino concealed exculpatory and/or impeachment evidence including but not limited to the following:

a. A $10,000 payment to Guevarra for a positive identification of Ciria through a "Secret Witness Program" maintained by the SFPD;

b. Known and unknown material benefits and/or payments made to Varela, in part, potentially, via the "Secret Witness Program" in exchange for false testimony implicating Ciria;

c. Detailed surveillance information collected by Rubino and other members of the SFPD that conclusively demonstrated Ciria's innocence, placing him at home during the time of the murder (as Ciria, Varela, Paiz, and Flores all told Gerrans and Crowley);

    d.   On information and belief, additional, intentionally unrecorded statements and/or information from eyewitnesses demonstrating that no witness made a positive identification of Ciria as the killer during the investigation;

    e.   Evidence of intentional, willful coercion of witnesses by Gerrans and Crowley;

    f.   Additional information to be discovered relating to defendants' repeated and ongoing misconduct throughout the investigation of Ciria.

105.    Gerrans and Crowley's case against Ciria was relatively weak, including because there was absolutely no physical evidence linking Ciria to the crime.  Therefore, had any of this exculpatory information been properly disclosed – including a five-figure payment to one of two eyewitnesses – Ciria likely would not have been convicted.  In that way, these defendants' failure to disclose exculpatory and impeachment evidence was a cause of Ciria's wrongful incarceration and related damages.

106.    The concealment of this evidence was deliberate, reckless, wanton, cruel, and/or was done with callous disregard and indifference to Ciria's constitutional rights.

107.    Gerrans, Crowley, and Rubino were each acting under the color of state law and within their scope of employment for the City and the SFPD during the concealment of this evidence, and none of them (nor any reasonable officer) would have believed that failing to disclose exculpatory evidence was lawful in 1990 and 1991.

108.    Further, the City and the SFPD violated their own obligations relating to Ciria's constitutional rights as an individual interacting with these entities.  The City and the SFPD had a duty to Ciria and those similarly situated to establish, implement, and follow policies, procedures, practices, and customs that prevented the infringement of Ciria's and others' constitutional rights.  Further, these defendants had a duty to adequately train, supervise, and monitor their employees and agents to prevent the infringement of Ciria's and others' constitutional rights.  Defendants and high-ranking officials employed by defendants or working on their behalf or as an agent of any defendant also had a duty to refrain from ratifying, or failing to act in the face of, constitutional violations effected by their employees or subordinates.

109.    The City and the SFPD, however, failed to prevent or redress Ciria's constitutional

injuries in the following ways:

    a.  By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from the SFPD officers withholding, concealing, and/or destroying exculpatory or witness impeachment evidence, including secret incentives provided for witness testimony, during and after criminal investigations and prosecutions;

    b.  By failing to adequately train, supervise, and/or discipline the SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the withholding, concealment, or destruction of exculpatory or witness impeachment evidence, particularly in cases against minorities in San Francisco, to the degree that such failure amounted to a deliberate indifference in the face of inadequacies likely to lead to repeated constitutional violations;

    c.  By maintaining a policy of, or failing to take any action or any remedial steps in the face of repeated constitutional violations stemming from a "Secret Witness Program" maintained by the SFPD, which, by its intended purpose, was virtually certain to cause constitutional violations through the intentional concealment of incentives provided to witnesses in exchange for incriminating testimony;

    d.  By failing to adequately train, supervise, and/or discipline SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the "Secret Witness Program" and the obvious associated risks of constitutional violations.

110.    The conduct of the City and the SFPD, including but not limited to their failure to maintain policies sufficient to prevent or failure to adequately train officers to prevent the repeated concealment of exculpatory and witness impeachment material while investigating racial minorities in San Francisco was a moving force behind the constitutional violations suffered by Ciria and other Black men in the time period of Ciria's investigation, prosecution, and conviction.

111.    Further, the City and the SFPD's inaction and deliberate indifference relating to the SFPD's concealment of exculpatory and witness impeachment material, including in the face of multiple

wrongful convictions of Black men stemming from these unconstitutional practices between at least (and not limited to) 1985 and 1995, were the moving force behind the egregious violations of Ciria's constitutional rights.

112.    As a result of defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages.  Ciria was also deprived of familial relationships and companionship and lost past and future earnings in an amount to be determined at trial.

113.    The misconduct described in this claim was objectively unreasonable and undertaken with reckless indifference to Ciria's constitutional rights, and Ciria seeks punitive damages against these individual defendants.

114.    Ciria further seeks costs and reasonable attorneys' fees against defendants, and each of them, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law.

**THIRD CLAIM FOR RELIEF**

**Deprivation of Civil Rights under 42 U.S.C. § 1983**

**(MALICIOUS PROSECUTION)**

**(Against All Defendants)**

115.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

116.    At all times relevant to this case, defendants had an obligation to comply with the due-process requirements set forth in the Fifth and Fourteenth Amendments to the United States Constitution.  Defendants failed to meet these due process obligations with respect to Ciria.

117.    Defendants Gerrans, Crowley, and Rubino, through their acts and omissions, caused criminal proceedings to be brought against Ciria without any reasonable belief in his guilt.  Ciria maintained his innocence throughout the investigation, and the version of events he first shared with the defendants – that he was home at the time of the murder – was corroborated by multiple witnesses, including Varela.  There was no physical evidence linking Ciria to the crime, and witness descriptions of the killer plainly and significantly differed from Ciria's appearance on the night of the murder.

118.    Instead, the only evidence tending to incriminate Ciria – the statements of Varela and unreliable witness identifications at trial – were manipulated, fabricated, and incentivized by Gerrans,

Crowley, and Rubino.  Further, all three defendants actively concealed exculpatory evidence, including evidence that Ciria was at home during the murder, collected through the SFPD's surveillance of Ciria.

119.    Accordingly, at the time of the arrest and submission of evidence to the District Attorney, no reasonable officer could have believed that there was legitimate probable cause to arrest Ciria – the only evidence linking him to the crime was simply made up.  These officers instead fabricated, documented, and reported false evidence stemming from coerced and unduly influenced witnesses, ultimately causing the unwarranted prosecution of Ciria.

120.    Further, the proceedings against Ciria were initiated with malice, as Gerrans, Crowley, and Rubino had set out to pin the murder on Ciria for reasons not fully understood.  But the threat was explicit – following an unwarranted, previous detainment of Ciria, Rubino told Ciria that he would "get him sooner or later."  These defendants initiated the investigation and triggered the prosecution of Ciria for the purpose of denying him his constitutional rights.

121.    Further, the City and the SFPD violated their own obligations relating to Ciria's constitutional rights as an individual interacting with these entities.  Specifically, the City and the SFPD had a duty to Ciria and those similarly situated to establish, implement, and follow policies, procedures, practices, and customs which prevented the infringement of Ciria's and others' constitutional rights.  Further, these defendants had a duty to adequately train, supervise, and monitor their employees and agents to prevent the infringement of Ciria's and others' constitutional rights.  Defendants and high-ranking officials employed by defendants or working on their behalf or as an agent of any defendant also had a duty to refrain from ratifying, or failing to act in the face of, constitutional violations effected by their employees or subordinates.

122.    The City and the SFPD, however, failed to prevent or redress Ciria's constitutional injuries in the following ways:

  a.  By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from SFPD officers targeting and pursuing Black men as suspects despite the presence and discovery of exculpating evidence, instead permitting systemic, implicit, and overt biases towards racial minorities in San Francisco to become a moving force behind

criminal investigations and prosecutions;

b. By failing to adequately train, supervise, and/or discipline SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to systemic racism as well as implicit and overt biases toward Black men in San Francisco such that racial minorities were unfairly targeted as suspects in criminal investigations despite the presence and discovery of exculpating evidence.

c. By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from SFPD officers fabricating evidence (including unreliable or manufactured eyewitness identifications) by coercing and pressuring witness to implicate Black men and people of color in San Francisco around the time period that Ciria was investigated, prosecuted, and convicted;

d. By failing to adequately train, supervise, and/or discipline SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the fabrication of evidence, particularly against minorities in San Francisco, to the degree that such failure amounted to a deliberate indifference in the face of inadequacies likely to lead to repeated constitutional violations;

e. By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from SFPD officers withholding, concealing, and/or destroying exculpatory or witness impeachment evidence, including secret incentives provided for witness testimony, during and after criminal investigations and prosecutions;

f. By failing to adequately train, supervise, and/or discipline SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the withholding, concealment, or destruction of exculpatory or witness impeachment evidence, particularly in cases against minorities in San

Francisco, to the degree that such failure amounted to a deliberate indifference in the face of inadequacies likely to lead to repeated constitutional violations;

g.   By maintaining a policy of, or failing to take any action or any remedial steps in the face of, repeated constitutional violations stemming from a "Secret Witness Program" maintained by the SFPD, which, by its intended purpose, was virtually certain to cause constitutional violations through the intentional concealment of incentives provided to witnesses in exchange for incriminating testimony;

h.   By failing to adequately train, supervise, and/or discipline SFPD officers with respect to core principles of due process sufficient to prevent constitutional violations relating to the "Secret Witness Program" and the obvious associated risks of constitutional violations.

123.   The conduct of the City and the SFPD, including but not limited to the actions described in the preceding paragraph, was a moving force behind the constitutional violations suffered by Ciria and other Black men in the time period of Ciria's investigation, prosecution, and conviction.

124.   Further, the City and the SFPD's inaction and deliberate indifference relating to these actions, including in the face of multiple wrongful convictions of Black men stemming from these unconstitutional practices between at least (and not limited to) 1985 and 1995, were the moving force behind the egregious violations of Ciria's constitutional rights.

125.   As a direct and proximate result of these defendants' conduct, Ciria was wrongfully arrested, tried, convicted, and imprisoned for a crime he did not commit.  If these defendants had not engaged in the acts and omissions described in this complaint, Ciria would have been spared more than three decades of wrongful imprisonment, abuse, and immense pain and suffering.

126.   As described herein, the criminal proceedings against Ciria were terminated in his favor in April of 2022.  Specifically, after Ciria submitted his habeas petition, the San Francisco County Superior Court vacated Ciria's conviction and sentence and dismissed all charges against him on April 18, 2022.

127.   As a result of these defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages.  Ciria was also deprived

of familial relationships and companionship and lost past and future earnings in an amount to be determined at trial.

128.     The misconduct described in this claim was objectively unreasonable and undertaken with reckless indifference to Ciria's constitutional rights, and Ciria seeks punitive damages against these individual defendants.

129.     Ciria further seeks costs and reasonable attorneys' fees against defendants, and each of them, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law.

**FOURTH CLAIM FOR RELIEF**

**Deprivation of Civil Rights under 42 U.S.C. § 1983**

**(CONSPIRACY)**

**(Against Defendants Gerrans, Crowley, and Rubino)**

130.     Plaintiff realleges all preceding paragraphs as though set out in full herein.

131.     At all times relevant to this case, defendants had an obligation to comply with the due-process requirements set forth in the Fifth and Fourteenth Amendments to the United States Constitution.  Defendants failed to meet these due process obligations with respect to Ciria.

132.     Defendants Gerrans, Crowley, and Rubino reached an agreement among themselves to fabricate a particular theory of guilt against Ciria for the murder of Bastarrica, and thereby deprive Ciria of his constitutional rights as set forth above.  This agreement was reached before Ciria's formal arrest and/or prosecution and remained in place throughout the entirety of his wrongful detention, prosecution, and incarceration.

133.     Gerrans and Crowley began forcing their false theory of the case on Varela from his very first interview with the inspectors, working in coordination and acting in concert to deprive Ciria of his constitutional rights from the outset of the investigation.  Gerrans and Crowley also improperly influenced identifications of Ciria by eyewitnesses in order to secure a conviction, despite obvious discrepancies between Ciria's appearance and the witness descriptions of the killer.  Further, together with Rubino, Gerrans and Crowley suppressed evidence of Ciria's innocence while simultaneously coercing and fabricating false statements and unreliable witness identifications.

134.     Gerrans, Crowley, and Rubino submitted false statements and reports to prosecutors and other policy makers inducing the prosecution and wrongful conviction of Ciria.  On information and belief, each of these defendants took additional actions in furtherance of this conspiracy to be discovered during litigation.

135.     In this manner, each of these defendants committed overt acts and were willful participants in concerted action to cause the depravation of Plaintiff's constitutional rights to accomplish a lawful or unlawful purpose by unlawful means in violation of 42 U.S.C. § 1983, the United States Constitution, the California Constitution, and California law.

136.     As a result of these defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages. Ciria was also deprived of familial relationships and companionship and lost past and future earnings in an amount to be determined at trial.

137.     The misconduct described in this claim was objectively unreasonable and undertaken with reckless indifference to Plaintiff's constitutional rights, and Plaintiff seeks punitive damages against the individual defendants.

## FIFTH CLAIM FOR RELIEF

**Violation of the Bane Act, California Civil Code § 52.1 – Deprivation of Civil Rights**

**(Against All Defendants)**

138.     Plaintiff realleges all preceding paragraphs as though set out in full herein.

139.     Defendants, and each of them, acting individually and in concert, by their acts, omissions, customs, policies acted with threat, coercion, and/or intimidation to violate Ciria's constitutional rights and his rights under the California constitution and law.

140.     As described above, each of the defendants attempted and/or completed acts of coercion, threats, or coercion in order to fabricate and falsify evidence, and concealed exculpatory evidence, for the purpose of wrongfully prosecuting and convicting Ciria in violation of his constitutional rights. These actions include, but are not limited to:

141.     SFPD officers, including Gerrans and Crowley, using threats, intimidation, or coercion to

fabricate witness statements and testimony implicating Ciria in a murder;

142.    SFPD officers, including Gerrans and Crowley, using threats, intimidation, or coercion to fabricate, influence, and/or falsify witness identifications in an attempt to cause the conviction and imprisonment of Ciria for a crime he did not commit;

143.    SFPD officers, including Gerrans, Crowley, and Rubino, using threats, intimidation, or coercion to maliciously cause an unwarranted prosecution of Ciria;

144.    On information and belief, SFPD officers, including Gerrans, Crowley, and Rubino, using threats, intimidation, or coercion to conceal, withhold, or destroy, or cause the concealment, withholding, or destruction, of evidence tending to exculpate Ciria or impeach witnesses against him.

145.    These attempted and completed acts interfered with Ciria's's federal constitutional rights, as well as his rights under the California Constitution (including Articles I §1, I § 13, I § 15, and I §17), Cal. Civil Code § 43, and California law.

146.    The City and the SFPD, through their actions, inactions, and omissions, are liable directly as "persons" under § 52.1, and further, are vicariously liable for the actions of individual defendants pursuant to Cal. Gov. Code. § 815.2.

147.    As a result of these actions of defendants, Ciria suffered a violation of his due process rights and was wrongfully incarcerated for more than three decades.

148.    As a result of defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages.  Ciria was also deprived of familial relationships and companionship, including with his parents, siblings, daughters, and grandchildren.  Ciria also lost past and future earnings in an amount to be determined at trial.  Ciria seeks all statutory and other damages permitted under § 52 and § 52.1, including attorney's fees.

149.    The misconduct described in this claim was objectively unreasonable and undertaken with reckless indifference to Plaintiff's constitutional rights, and Plaintiff seeks punitive damages against the individual defendants.

## SIXTH CLAIM FOR RELIEF

### Conspiracy – California Law

### (Against Gerrans, Crowley, and Rubino)

150.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

151.    Gerrans, Crowley, and Rubino reached an agreement among themselves to fabricate a particular theory of guilt against Ciria for Bastarrica's murder and thereby deprive him of his constitutional rights as set forth above.  This agreement was reached before the formal arrest and/or prosecution of Ciria and remained in place throughout the entirety of his wrongful detention, prosecution, incarceration, and attempted re-prosecution.

152.    These defendants, in coordination and acting in concert, coerced and fabricated the testimony and identifications of multiple witnesses, submitted false statements and reports to prosecutors and other policy makers, and concealed exculpating evidence, inducing the prosecution and wrongful conviction of Ciria.

153.    In this manner, these defendants, and each of them, committed overt acts and were willful participants in concerted action to cause the deprivation of Ciria's constitutional rights to accomplish a lawful or unlawful purpose by unlawful means.

154.    As a result of these defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages.  Ciria was also deprived of familial relationships and companionship, including with his parents, siblings, daughters, and grandchildren.  Ciria also lost past and future earnings in an amount to be determined at trial.  Ciria also seeks all statutory and other damages permitted under § 52 and § 52.1, including attorney's fees.

155.    The misconduct described in this claim was objectively unreasonable and undertaken with reckless indifference to Ciria's constitutional rights, and Ciria seeks punitive damages against the individual defendants.

## SEVENTH CAUE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against All Defendants)

156.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

157.    Defendants, and each of them, engaged in conduct relating to the investigation and prosecution of Ciria that was so outrageous and extreme that it exceeded all bounds of conduct typically tolerated in a civilized community and, further, exceeded all possible bounds of decency such that a

reasonable person would not find this conduct tolerable.

158.    Defendants, and each of them, intended to cause Ciria emotional distress and/or acted with reckless disregard of the probability that he would suffer emotional distress.

159.    As a direct and proximate result of defendants' conduct, Ciria spent more than 30 years in prison for a crime he did not commit, and endured physical and mental suffering, anguish, fear, horror, anxiety, worry, and shock.

160.    The actions of defendants, and of each of them, were a substantial factor in causing Ciria's emotional distress.

161.    The actions of defendants, and of each of them, were done with deliberate indifference to Ciria's physical and emotional safety, or were done recklessly, intentionally, maliciously, and/or outrageously and with disregard and deliberate indifference to Ciria's basic constitutional rights.  This conduct is so outrageous and despicable as to entitle Ciria to recover punitive damages from the individual defendants in this action.

## EIGHTH CAUSE OF ACTION

### False Imprisonment – State Law

### (Against All Defendants)

162.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

163.    Defendants, and each of them, acted in concert and under the color of law to prosecute Ciria and hold him without lawful privilege, without his consent, for more than 30 years.

164.    Specifically, defendants caused Ciria's wrongful imprisonment by knowingly and intentionally, or with conscious disregard for their actions, developing, presenting, and prosecuting Ciria based on false evidence, namely, coerced and falsified witness statements and identifications.

165.    Defendants developed, recorded, reported, and presented this evidence to prosecutors despite knowing or maintaining a reckless disregard for the fact that the evidence was false.  Further, defendants Gerrans, Crowley, and Rubino caused and participated in the arrest and physical confinement of Ciria without justification and based only on evidence these defendants knew to be false.

166.    Defendants' seizure and confinement of Ciria, with no reliable evidence against him, was intentional, unreasonable, with malice, and amounted to conscious or reckless disregard for Ciria's

rights.

167.    As a result of defendants' actions, Ciria suffered severe mental anguish, pain, and injury for which he has incurred and will continue to incur significant damages.  Ciria was also deprived of familial relationships and companionship, including with his parents, siblings, and son.  Ciria also lost past and future earnings in an amount to be determined at trial.

### NINTH CLAIM

### Indemnification Pursuant to Cal. Gov. Code § 815.2

### (Against the City and the SFPD)

168.    Plaintiff realleges all preceding paragraphs as though set out in full herein.

169.    Defendants Gerrans, Crowley, and Rubino caused the injuries to Ciria described herein by their own misconduct.

170.    At all times, these defendants were acting within the scope of their employment by the City and the SFPD.

171.    California law permits that: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  Cal. Gov. Code § 815.2.

172.    Here, these defendants committed tortious acts against Ciria while carrying out their investigative function as employees of the City and the SFPD, and such conduct was foreseeable by these defendants, the City, and the SFPD.

173.    These acts and omissions proximately caused Ciria's injuries and damages described herein, which are recoverable under state tort law and statute, including but not limited to the Bane Act. California Civil Code § 52.1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment in its favor against defendants as follows:

a.    General damages of Plaintiff, in the amount to be proven at trial;

b.      Special damages of Plaintiff, in the amount to be proven at trial;

c.      Punitive and exemplary damages against the individual defendants (not municipality defendants), and each of them, in an amount appropriate to punish them and deter others from engaging in similar misconduct;

d.      Statutory damages as permitted by Cal. Civil Code § 52.1 et seq., (the Bane Act)

e.      Prejudgment interest, as allowed by law;

f.      Costs and reasonable attorneys' fees against defendants, and each of them, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law; and

g.      Any and all other legal and equitable relief as the Court may deem proper.


Dated: November 29, 2022                          Respectfully submitted,



                                        By:    */s/ James P. Bennett*
                                               James P. Bennett
                                               George C. Harris
                                               Matthew Ohlheiser
                                               The Norton Law Firm PC
                                               Attorney for Plaintiff Joaquin Ciria

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Joaquin Ciria hereby demands a trial by a jury on all issues triable by a jury.


Dated: November 29, 2022                              Respectfully submitted,


By:   */s/ James P. Bennett*
_____
James P. Bennett
George C. Harris
Matthew Ohlheiser
The Norton Law Firm PC
Attorney for Plaintiff Joaquin Ciria