1

2

3

4                      UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    JOAQUIN CIRIA,                          Case No. 4:22-cv-07510-KAW

8                  Plaintiff,                **ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANTS'**
9          v.                                **MOTION FOR SUMMARY
                                             JUDGMENT**
10   CITY AND COUNTY OF SAN
     FRANCISCO, et al.,                      Re: Dkt. No. 82
11
                  Defendants.
12

13        On February 8, 2024, Defendants City and County of San Francisco, James Crowley,

14   Arthur Gerrans, Nicholas Rubino filed a motion for summary judgment.

15        On May 2, 2024, the Court held a hearing, and, having considered the parties' filings and

16   the relevant legal authorities, GRANTS IN PART AND DENIES IN PART Defendants' motion

17   for summary judgment.

18                            **I.    BACKGROUND**

19   **A.    Factual Background[1]**

20        Inspector Arthur Gerrans and Inspector James Crowley were assigned to investigate the

21   March 24, 1990 murder of Ruben Alfonso and the March 25, 1990 murder of Felix

22   "Carlos/Carlito" Bastarrica. (Decl. of James Crowley, "Crowley Decl.," Dkt. No. 82-2 ¶ 3; Decl.

23   of Arthur Gerrans, "Gerrans Decl.," Dkt. No. 82-27 ¶ 3).

24

25   ---

26   [1] The parties submitted a joint statement of facts on April 19, 2024. (Dkt. No. 104.)  The Court
     includes the citations provided by the parties, and citations to facts and exhibits that were not
27   addressed in the joint statement. To the extent that certain facts do not contain citations, those have
     been stipulated to in the joint statement of facts. To the extent that certain background facts
28   provided in the joint statement of facts are not included for the sake of brevity, they are
     incorporated herein.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On the night of March 24, 1990 Ruben Alfonso was shot to death on the street in front of the Star Hotel in the Mission District. Officer M. Torres made an incident report relating to this killing and the incident report is dated March 24, 1990. (Crowley Decl. ¶ 9, Ex. 3.)

On Sunday March 25, 1990 at about 9:00 p.m., there was a killing in the South of Market neighborhood in the vicinity of 254 Clara Street. Inspector Gerrans and Inspector Crowley responded to the scene. (Crowley Decl. ¶¶ 4, 10, Ex. 2.)  Clara Street is a one-way alley running in part between 5th and 6th Streets in the South of Market neighborhood.  Victim Felix Bastarrica was shot in the vicinity of the driveway of the Bay Bridge Motel. Officer D.C. Murphy made an incident report, which is dated March 25, 1990. (Incident Report 3/25/90, Crowley Decl. ¶ 11, Ex. 4.)  During the investigation, the inspectors made handwritten notes dated March 25, 1990 of speaking to Anthony Queen and Kenneth Duff. (Duff and Queen 3/25/90 notes, Crowley Decl. ¶ 13, Ex. 5.)

During the investigation, the inspectors made handwritten notes dated March 25, 1990 of speaking to Kathleen Guevara. (Guevara 3/25/90, Crowley Decl. ¶ 14,  Ex. 6.)

On March 25, 1990, the inspectors obtained a rap sheet for Felix Bastarrica. (Crowley Decl. ¶ 16, Ex. 8.)  On March 26, 1990, the inspectors pulled an SFPD incident report for Bastarrica's December 27, 1989 arrest at 2266 Cayuga Avenue (Incident No. 891681532). (Crowley Decl. ¶ 21, Ex. 11, CCSF-CIRIA-000378-385.) The report references a December 27, 1989 drug seizure at the Amazon Hotel. (Crowley Decl. ¶ 21.)  A December 27, 1989 incident report for drug arrests at the Amazon Hotel (Incident No. 891680932) states that five people were arrested at 5060 Mission Street, including Joaquin Ciria, who was listed as being 5'9", 193 lbs., and a "N/M," i.e., Black. (Crowley Decl. ¶ 22, Ex. 12, CCSF-CIRIA-000388-391.)  After reviewing this incident report, the inspectors pulled a mugshot and rapsheet for Joaquin Ciria. Identification records from SFPD indicated that Ciria's place of birth was "Cuba." (Crowley Decl. ¶ 22, Ex. 14, CCSF-CIRIA-000243.)

On March 28, 1990, the inspectors met with Kathleen Guevara to have her view an array of six mugshots of potential suspects. The mugshots included Joaquin Ciria's mugshot from his December 27, 1989 arrest. Inspector Crowley made handwritten notes dated March 28, 1990

United States District Court
Northern District of California

1  regarding this meeting with Kathleen Guevara. (Crowley Decl. ¶ 36, Ex. 27.)  The notes explain

2  that Guevara picked out Plaintiff because his mug shot "looks the most like the suspect." *Id.*

3          On April 13, 1990, Plaintiff and his attorney met with the inspectors. The meeting was not

4  recorded, but Inspector Gerrans made notes. (Ciria 4/13/1990 notes, Crowley Decl. ¶ 49, Ex. 45,

5  CCSF-CIRIA_000168-170.)

6          On April 17, 1990, the inspectors met with George Varela in the Homicide Detail for a

7  recorded interview. (4/17/90 Varela Interview Tr., Ohlheiser Decl. ¶ 3, Ex. 1; 4/17/90 Varela

8  Interview Audio, Crowley Decl. ¶ 51, Exs. 46-1, 46-2, 46-3.)

9          On April 18, 1990, Inspector Crowley prepared and swore out an affidavit requesting a

10  search warrant for Plaintiff's residence, as well as a criminal complaint, and an affidavit in support

11  of the issuance of a warrant for Plaintiff's arrest. (Crowley Decl. ¶¶ 64-65.)  On April 18, 1990,

12  Municipal Court Judge Mary Morgan signed both warrants. (Case Chronology, Crowley Decl. ¶ 4,

13  Ex. 2 at CCSF-CIRIA-000053; Search warrant with affidavit, Crowley Decl. ¶ 64, Ex. 50; Arrest

14  warrant, Crowley Decl. ¶ 65, Ex. 51.)

15          On April 19, 1990, Inspector Gerrans completed an incident report relating to the

16  execution of a search warrant at 159 Sickles Street. (Crowley Decl. ¶ 69, Ex. 55, CCSF-

17  CIRIA_000078-79).

18          On April 19, 1990, Officer Nicolas Rubino completed an incident report relating to the

19  arrest of Ciria. (Rubino Decl. ¶ 17, Ex. D, CCSF-CIRIA_000095-96).

20          There is no documented communication between Officer Rubino and the inspectors

21  regarding Plaintiff until April 19, 1990, the day of Plaintiff's arrest. (Rubino Decl. ¶ 18; Gerrans

22  Decl. ¶ 71; Crowley Decl. ¶ 71; Pl.'s Resp. to Defs.' Reqs. for Admission Nos. 5-6, Wiener Decl.

23  ¶ 4, Ex. C.)

24          On April 19, 1990, following Ciria's arrest, the inspectors made a tape-recorded interview

25  with Ciria.  During that interview, the inspectors stated that they visited Galan's Bar the prior day.

26  They stated that they spoke with a bartender and that the bartender said that the person who was

27  bartending on March 25, 1990 was in the hospital. (Audio, Crowley Decl. ¶ 68, Ex. 52; 4/19/90

28  Ciria Tr., Crowley Decl. ¶ 68, Ex. 53.)

1    On April 19, 1990, the inspectors conducted a tape-recorded interview with Kristina

2  Martin. (Martin Audio, Crowley Decl. ¶ 74, Ex. 61; Martin 4/19/90 Tr., Crowley Decl. ¶ 74, Ex.

3  62.)  Martin was Varela's girlfriend, and she told the inspectors that Varela told her a day or two

4  after the shooting that "he was just giving Joaquin a ride somewhere, and Joaquin got out. And he

5  seen this man that, I guess, supposedly had killed his friend or something. And he got out, and he

6  was arguing with him. And I guess he just shot him." (Crowley Decl. ¶ 74.)

7    During the investigation, the inspectors made notes, dated April 26, 1990, of a line-up

8  identification procedure with Kathleen Guevara. (4/26/90 1855 Guevara notes, Crowley Decl. ¶

9  76, Ex. 66, CCSF-CIRIA_151).  Guevara selected Plaintiff and wrote the word "possible." *Id.*  She

10  then told the inspectors, "I am not 100% sure. I am almost sure- about 80%. I know #4 was the

11  same photo I had picked out before…. I wrote the word 'possible' because I knew I had seen this

12  man's photo before." *Id.*  Also on April 26, 1990, Guevara signed a document titled "Line Up

13  Record / Instructions for Line-Up Witnesses." (Crowley Decl. ¶ 76, Ex. 65.)

14    Following his April 19, 1990 booking, Plaintiff was arraigned on April 24, 1990. (Decl. of

15  Louis Lipset, "Lipset Decl.," Dkt. No. 23-30 ¶ 3, Ex. A at D.A. 005613.)  Plaintiff's preliminary

16  hearing occurred on September 4, 1990. Kathleen Guevara, Kenneth Duff, and the medical

17  examiner testified. (9/4/90 Tr., Wiener Decl. ¶ 7, Ex. E.) The Superior Court found probable cause

18  to hold Plaintiff over for trial. *Id.*  Plaintiff's murder trial began on February 4, 1991. (Wiener

19  Decl. ¶ 19, Ex. Q at 656.)  On February 20, 1991, Plaintiff was convicted for Bastarrica's murder.

20  (Compl. ¶ 2, Wiener Decl. ¶ 8, Ex. F at CIRIA003146-47, RT 956-57.

21    Plaintiff filed a Petition for Writ of Habeas Corpus in the Superior Court for the County of

22  San Francisco on January 19, 2021.  Plaintiff's conviction was vacated on April 18, 2022. (4/19/22

23  Superior Court Order and 4/18/22 Superior Court Minutes, Ohlheiser Decl. ¶ 41, Ex. 39.)  Plaintiff

24  was released from custody on April 20, 2022.

25    Plaintiff presented a pre-litigation Government Claim on September 19, 2022. ECF No.

26  82-29 at p. 41; 76-97 (Claim, Wiener Decl. ¶ 9, Ex. G.)

27    **B.    Procedural Background**

28    On November 29, 2022, Plaintiff filed the instant case against Defendants City and County

United States District Court
Northern District of California

1    of San Francisco, San Francisco Police Department, Arthur Gerrans, James Crowley, and Nicolas

2    J. Rubino, asserting civil rights claims based on his wrongful incarceration of more than thirty

3    years.  (Compl. ¶¶ 1-2, Dkt. No. 1.)

4        On February 8, 2024, Defendants filed a motion for summary judgment. (Defs.' Mot.,

5    Dkt. No. 82.)  On March 7, 2024, Plaintiff filed an opposition. (Pl.'s Opp'n, Dkt. No. 89.)  On

6    March 22, 2024, Defendants filed a reply. (Defs.' Reply, Dkt. No. 95.)  Therein, Defendants raised

7    a myriad of objections to Plaintiff's evidence, so, on April 11, 2024, the Court ordered Defendants

8    to file formal objections. (*See* Dkt. No. 99.)  On April 15, 2024, Defendants filed formal

9    objections. (Defs.' Obj., Dkt. No. 101.)  On April 22, 2024, Plaintiff responded to Defendants'

10   objections. (Pl.'s Obj. Resp., Dkt. No. 106.)

11       On April 1, 2024, Plaintiff filed a statement of recent decision. (Dkt. No. 97.)  On April 11,

12   2024, the Court ordered Plaintiff to file a supplemental brief addressing the filing. (Pl.'s Suppl.

13   Br., Dkt. No. 102.)  On April 22, 2024, Defendants filed a supplemental brief in response. (Defs.'

14   Suppl. Br., Dkt. No. 105.)

15                              **II.    LEGAL STANDARD**

16       A party may move for summary judgment on a "claim or defense" or "part of... a claim or

17   defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate

18   discovery, there is no genuine issue as to material facts and the moving party is entitled to

19   judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

20   Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,*

21   477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient

22   evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

23       A party seeking summary judgment bears the initial burden of informing the court of the

24   basis for its motion, and of identifying those portions of the pleadings and discovery responses

25   that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where

26   the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no

27   reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City*

28   *of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

United States District Court
Northern District of California

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.    DISCUSSION

#### A.    Claims against Nicholas Rubino

At the hearing, Plaintiff confirmed that the only claim he was still asserting against Officer Rubino is the second cause of action for nondisclosure of evidence. Accordingly, summary judgment is granted as to all other claims against Defendant Rubino.

#### B.    Nondisclosure claim

The second cause of action is for nondisclosure of evidence against all defendants. In sum,

1    Plaintiff contends that Gerrans, Crowley, and Rubino deprived him of a fair trial by withholding

2    exculpatory materials and impeachment evidence from Ciria and prosecuting attorneys in violation

3    of *Brady v. Maryland,* 373 U.S. 83 (1963) and the Fourteenth Amendment. (Compl. ¶ 103.)  They

4    allegedly did this by concealing exculpatory and/or impeachment evidence including: a $10,000

5    payment to Guevara for a positive identification of Ciria through the SFPD's "Secret Witness

6    Program," known and unknown material benefits to Varela in exchange for false testimony for

7    implicating Ciria, detailed surveillance information collected by Rubino and others demonstrating

8    his innocence by placing him at home during the time of the murder, and that Defendants

9    intentionally withheld information demonstrating that there was no positive eyewitness

10   identification. (Compl. ¶ 104.)

11        To prevail on a claim under *Brady*, the plaintiff must prove that "(1) the withheld evidence

12   was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was

13   suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff." *Smith v.*

14   *Almada*, 640 F.3d 931, 939 (9th Cir. 2011).  Evidence is material "if there is a reasonable

15   probability that, had the evidence been disclosed to the defense, the result of the proceeding would

16   have been different." *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003) (internal quotation marks

17   and citation omitted).  In order to show prejudice, the plaintiff need not show that it is more likely

18   than not that the withheld evidence would have resulted in his acquittal, but only that the withheld

19   evidence "could reasonably be taken to put the whole case in such a different light as to undermine

20   confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

21        In his opposition, Plaintiff narrowed this claim to Defendants' withholding material

22   information regarding his appearance and whereabouts the night of the murder and the

23   withholding of exculpatory surveillance information that would have confirmed his alibi. (Pl.'s

24   Opp'n at 29-31.)  Neither of these theories are actionable.

25        First, the issue of Plaintiff's appearance was known to Plaintiff, and the hairstyle

26   discrepancy was litigated at trial, so even if Crowley and Gerrans did not take notes of witness

27   statements that described Plaintiff's clothing and hairstyle differently at Galan's Bar than as

28   described at the preliminary hearing, that information came out during the proceedings, so there is

United States District Court
Northern District of California

1    no reasonable probability that disclosure would have changed the outcome. (*See* Defs.' Reply at

2    16-17.)  Even if there was, it is not "beyond debate" that the Constitution was violated based on

3    these particular facts, since it was arguable that this information was known to Plaintiff. *See*

4    *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011).

5         Second, Plaintiff's only evidence that the San Francisco Police Department engaged in a

6    massive three-month surveillance operation, and that SFPD officers were parked outside his home

7    on the night of the murder is his own deposition testimony. (*See* Pl.'s Opp'n at 32.)  Specifically,

8    Plaintiff testified that he knew he was being surveilled because his "street sense" told him they

9    were police and the undercover cars had "E" government license plates. (Pl.'s Ciria Dep.,

10   Ohlheiser Decl. ¶ 52, Ex. 50 at 281:17-282:25.)

11        "[I]f the factual context renders respondents' claim implausible… [the plaintiff] must come

12   forward with more persuasive evidence to support their claim than would otherwise be necessary."

13   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89

14   L. Ed. 2d 538 (1986).  Defendants put forth sufficient evidence to rebut Plaintiff's conclusion that

15   he was not only surveilled but that the surveillance confirmed that he was home at the time of the

16   murders through the declaration of John Tursi.  Tursi worked in the Narcotics Detail from 1988 to

17   1995, and, after his retirement, continues to work there part-time. (Tursi Decl., Dkt. No. 82-36 ¶

18   2.)  Tursi explained that, in 1989 and 1990, the Narcotics Detail was the division responsible for

19   any surveillance operation lasting more than a day or two and for any operations that went beyond

20   the 10 police districts. (Tursi Decl. ¶ 3.)  Furthermore, in 1989 and 1990, the Narcotics Detail

21   never engaged in surveillance for months at a time, and that it was rare for any surveillance to last

22   for more than a week. (Tursi Decl. ¶ 4.)  Tursi further explained that the Narcotics Detail never

23   used cars with an "E" license plate, because that would immediately reveal law enforcement

24   activity, and the Narcotics Detail personnel were not well-groomed while doing undercover

25   surveillance. (Tursi Decl. ¶ 5.)  Instead, they did their "best to look like drug dealers and drug

26   users, or members of the community [they] were working in, and otherwise not like police." *Id.*

27   This declaration directly contradicts Plaintiff's testimony that he knew he was being surveilled

28   because the vehicles had government plates.  While the Court does not doubt that Plaintiff

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    believed he was under surveillance, he has not provided persuasive evidence to support his

2    testimony—in fact, his testimony defies common sense—which falls short of what is required to

3    create a genuine factual dispute on summary judgment even when making all reasonable

4    inferences in favor of the nonmoving party.

5        Accordingly, summary judgment is granted as to the nondisclosure cause of action.[2]

6        **C.    Fabrication of Evidence claim**

7        The first cause of action for fabrication of evidence claim is asserted against all defendants.

8    "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the

9    defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the

10   plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

11   Defendants contend that Plaintiff cannot prove either element, and that even if he could, the

12   officers are entitled to qualified immunity. (Defs.' Mot. at 21-26.)

13       A plaintiff may establish the first element of a fabrication claim – that the defendants

14   deliberately fabricated evidence – by direct evidence such as "direct misquotation of witnesses in

15   investigative reports." *Spencer*, 857 F.3d at 799.  Alternatively, a plaintiff may show that the

16   defendants continued their investigation of the plaintiff "despite the fact that they knew or should

17   have known that he was innocent," or that the defendants "used investigative techniques that were

18   so coercive and abusive that they knew or should have known that those techniques would yield

19   false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001); *see also Spencer*,

20   857 F.3d at 799 (quoting *Devereaux*).

21       As the parties moving for summary judgment, Defendants have the initial burden to show

22   that Plaintiff cannot prove that Crowley and Gerrans deliberately fabricated evidence. As an initial

23   matter, despite Defendants' argument to the contrary, they did not have "ample evidence that

24   Plaintiff was Bastarrica's murderer" at the time of George Varela's interview on April 17, 1990.

25   (*See* Defs.' Mot at 24-25.)  As discussed in more detail below, while Crowley and Gerrans may

26   not have fabricated the eyewitness identifications of Guevara and Duff, the identification process

27

28   ─────────────────
     [2] Now, no claims remain against Defendant Rubino.

were suggestive and the identifications themselves were later presented at the preliminary hearing as being more reliable than they actually were. *See* discussion, *infra,* Part III.D.i.b.

### i. Whether the Varela Interview was Coercive

Defendants first argue that Crowley and Gerrans did not coerce Varela into naming Plaintiff, because he told his girlfriend three weeks earlier that Plaintiff was the shooter. (Defs.' Mot. at 22.)  This argument is unavailing, because Kristina Martin did not "confirm" that Varela named Plaintiff as the shooter until **after** Plaintiff's arrest. (*See* Crowley Decl. ¶ 74.)  Given that Martin testified at deposition that she had no recollection of what Varela told her about the shooting, and surmised that she was repeating what Varela had said, a reasonable jury could conclude that Varela told Martin what to say. (*See* Pl.'s Opp'n at 21-22 (citing Pl.'s Martin Dep.[3] at 14:2-5.)

Nonetheless, the crux of Defendants' argument is that the Varela interview was not "so coercive and abusive that [they] knew or should have known that those techniques would yield false information." (Defs.' Mot. at 23 (quoting *Devereaux*, 263 F.3d at 1076).)  Defendants suggest that law enforcement needs to engage in extreme or aggressive conduct to find coercion under the *Devereaux* line of cases, but courts in this district have not imposed such a stringent requirement. *See Truelove v. City and County of San Francisco*, No. 16-cv-050 YGR, 2018 WL 3429113, at *3 (N.D. Cal. July 16, 2018).  Indeed, it can be enough to threaten to charge the witness with murder if they did not provide the desired information. *Id.* (citing *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

Here, Defendants argue that Crowley and Gerrans "never threatened to make Varela's predicament worse than it already was, by virtue of Varela's having driven his car used in the murder and lying about it." (Defs.' Mot. at 23.)  Defendants claim that they only told "Varela the advantages of telling the truth in his situation," which was proper. *Id.* at 23-24.  The Varela interview transcript, however, belies any assertion that he was not threatened.  Varela initially told the inspectors that he was with Ciria the night of the murder, but that he drove him home in his

---

[3] Plaintiff later filed a corrected, authenticated deposition transcript of the Kristina Martin deposition. (*See* Suppl. Ohlheiser Decl., Dkt. No. 106-1, Ex. B.)

United States District Court
Northern District of California

very identifiable vehicle (a Monte Carlo with body damage) prior to the time of the murder, which corroborated Ciria's alibi that he was home at the time of Bastarrica's murder. (4/17/90 Varela Interview Tr. at 14-17, 21-22.)

When that information was not consistent with the inspectors' theory of the case, Crowley and Gerrans threatened to charge Varela with murder if he did not identify Plaintiff as the shooter:

> Inspector: Okay I want to tell you something. Do you understand how the law works-- can you look at me?
>
> Varela: Hm?
>
> Inspector: Can you look at me? You understand how the law Works, if -- if two people go out together, alright? And they take type -- any type of action where -- you said you don't know, in your mind, you don't know that Joaquin was planning on killing somebody. Just say you go with Joaquin, and in your mind you know that he's either going beat a guy, he's going to beat somebody up, or maybe he's going to rob somebody, or maybe he's going to thump somebody, or kick his ass So you don't know, in your mind, you're not planning on killing him. Okay? So you go with him, and you're -- you know that Joaquin is going maybe jump on somebody and beat the shit out of somebody. **And just say you're driving the car, and Joaquin gets out and he shoots somebody, and you're driving that car alright? You could be tried for murder. You could be tried as being a part of the murder because you would be a principle in the murder, or you could be tried as an accessory to the murder which means that you helped somebody in _____**

(4/17/90 Varela Interview Tr. at 25 (emphasis added).)  The inspector continued:

> Alright, well,-- alright, we've talked to some people, okay? Okay. There were some people sitting there in that alley. Two guys, okay? And they saw. They saw the driver, saw a passenger, they saw a car go by, a car come back around, a car go back down the alley. **You got yourself into a situation, you know, and we know you didn't do it. But if you're going to continue to sit in here and lie and cover up for Joaquin, you're going to be in some deep shit, because we know** -- we don't speak Spanish, we know who got out of the car, we have witnesses because – see, the problem was he argued and fought out there with a guy and yelled and screamed and people came out and looked out the window. **And they saw your car, _____- car, the**

11

_____- sitting out watching, and you're yelling back and forth in Spanish. You know. And you have went there _____ want to see somebody and you didn't know what went down. _____ went down **The shit went down, it went sour, he shot, he jumped back in your car, and you drove off and that's exactly what happened. And be honest with us son. You're only 18 years old, you've been shit as a juvenile, you don't want to get in shit as an adult** – hey.

(4/17/90 Varela Interview Tr. at 26 (emphasis added).)  Varela merely responded, "Alright." *Id.*

Gerrans then told him, "What you ought to do is tell us exactly what happened. No lies. For your

own good, son. Okay? It's best for you to tell us exactly what went down. We know you didn't do

it. We know---" (4/17/90 Varela Interview Tr. at 26.)  To which Varela responded, "I didn't know

what was going to happen. I didn't know what was going to_____ Hey, whatever you said." *Id.*

In totality, a jury could find that the inspectors' conduct was coercive enough to constitute

a fabrication of evidence.  First, Varela was only 18 years old. Second, the inspectors threatened to

charge Varela with murder for driving the Monte Carlo, and then told him exactly what he needed

to say to avoid being charged.  Third, while he initially appeared at the interview voluntarily, the

tape recording and transcript indicates that Varela did not feel free to leave, because he asked,

"Can I go home after this?" (4/17/90 Varela Interview Tr. at 28.)  The response was, "After we

talk? Yeah. Yeah." *Id.*  Varela then told the inspectors in his own words happened, while

identifying Plaintiff as the shooter. *Id.*  Later, Varela confirmed that he was talking to them

because he wanted to be a witness rather than a suspect:

> Crowley:  Okay. So, when you came here today and you began to talk to us and we told you we suspected that you were with him, is that correct?
>
> Varela:  Yeah.
>
> Crowley:  And you did not want to be considered as being part of this, as a suspect in this case, rather than a witness in this case, is that correct?
>
> Varela:  Right.
>
> Crowley: Huh?
>
> Varela:  That's right.
>
> Crowley:  And the truth of the matter was, was that only that you

12

were a witness and you weren't involved.

Varela: I just saw. If I would have been involved, I wouldn't have come down here saying what I said. I wouldn't even've came down here, I would have left.

(4/17/90 Varela Interview Tr. Tape #3, Ohlheiser Decl. ¶ 45, Ex. 43 at 14-15.)

Unlike the *Devereaux* line of cases, the Varela interview went beyond explaining to a witness the advantages of telling the truth; it involved inspectors threatening an 18-year-old, who had a juvenile record, with an adult murder charge for driving a vehicle they knew was involved in the Bastarrica murder. Then, they told him exactly what information was necessary to protect himself from that adult murder charge and to, instead, serve as a witness. In *Gantt*, the Ninth Circuit found that the threat of a murder charge combined with the witness's claim that he had been awake for two straight days on a crack binge was sufficient under *Devereaux* for the claim to go to the jury. *Gantt*, 717 F.3d at 708 (quoting *Devereaux*, 263 F.3d at 1076). Here, the threat of a murder charge when they established that Varela and his car were at the scene of the shooting, along with feeding him the story he needed to tell to avoid it, could lead a jury to find that Crowley and Gerrans should have known that their techniques would yield false information.

### ii.    Qualified Immunity

While acknowledging that *Devereaux* established a general right to not be charged based on deliberately fabricated evidence, Defendants argue that Plaintiff must identify case law in 1990 that clearly established to the inspectors that they knew they were violating *Devereaux*. (Def.'s Mot. at 26.)

In opposition, Plaintiff argues that *Devereaux* found "that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." (Pl.'s Opp'n at 24 (citing *Devereaux*, 263 F.3d at 1074–75).) Moreover, Plaintiff argues that it was well established prior to 1990 that improper investigative techniques include psychological coercion through threats and promises. (Pl.'s Opp'n at 25.) Citing *United States v. Tingle*, Plaintiff contends that "a confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id.* (citing *United*

13

1   *States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8

2   (1964)).)  While *Tingle* was a Fifth Amendment case, Plaintiff argues that "[t]he same principles

3   have long been recognized under the Fourteenth Amendment." (Pl.'s Opp'n at 26 (citing cases).)

4       At his deposition, Crowley acknowledged that he understood that psychologically coercive

5   interrogation techniques are inappropriate because "you don't want to lead a person into giving

6   you false information to protect himself or herself." (Pl.'s Crowley Dep., Ohlheiser Decl. ¶ 7, Ex.

7   5 at 45:3-8.)  Based on these cases cited by Plaintiff and others contained in his briefing, the Court

8   finds that it was clearly established in 1990 that Crowley and Gerrans should have known that

9   they were eliciting false evidence from Varela through their interrogation techniques, so they are

10  not entitled to qualified immunity.

11      **D.    Malicious Prosecution claim**

12      The third cause of action for malicious prosecution claim is asserted against all defendants.

13  Defendants argue that Plaintiff cannot establish the elements of his malicious prosecution claim,

14  and that even if he could, the officers are entitled to qualified immunity. (Defs.' Mot. at 18.)  In

15  opposition, Plaintiff argues that there is sufficient evidence to proceed to trial on the malicious

16  prosecution claim and that the officers are not entitled to qualified immunity. (Pl.'s Opp'n at 25,

17  28.)

18      "In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that

19  the defendants prosecuted [him] with malice and without probable cause, and that they did so for

20  the purpose of denying [him] equal protection or another specific constitutional right." *Lassiter v.

21  City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) (internal quotation marks and citation

22  omitted, alterations in original).

23      Federal courts look to state law to define these elements of a § 1983 malicious prosecution

24  claim. *See Rezek v. City of Tustin*, 684 F. App'x 620, 621 (9th Cir. 2017) ("However, the elements

25  of Rezek's malicious prosecution claims are controlled by California state law."); *Awabdy v. City

26  of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) ("[W]e have incorporated the relevant elements

27  of the common law tort of malicious prosecution into our analysis under § 1983."); *Usher v. City

28  of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987) (applying California state law to elements of §

United States District Court
Northern District of California

1983 malicious prosecution claim).

In addition to the elements listed above, "[a]n individual seeking to bring a malicious prosecution claim must generally establish that the prior proceedings terminated in such a manner as to indicate his innocence." *Awabdy*, 368 F.3d at 1068. A criminal defendant may sue not only the prosecutor for malicious prosecution, but also police officers and investigators who wrongfully caused his prosecution. *See Usher*, 828 F.3d at 562 (reversing dismissal of § 1983 malicious prosecution claim against arresting officers and city).

As the parties moving for summary judgment, Defendants have the initial burden to show that Plaintiff cannot prove these elements. The requirement that the prior proceedings terminated favorably is undisputed, as this has already been addressed as a matter of law. (8/25/23 Order Granting Mot. for Reconsideration, Dkt. No. 56 at 5.)

### i. Probable Cause determination

First, Defendants argue that probable cause existed, which defeats this claim against all defendants. (Defs.' Mot. at 18.)  "[P]robable cause is an absolute defense to malicious prosecution." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009).  "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby,* 583 US. At 57 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983) (internal quotations omitted)).

 "Generally, 'the existence of probable cause is a question for the jury,' though summary judgment is appropriate when there is no genuine issue of fact and if 'no reasonable jury could find an absence of probable cause under the facts.'" *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023) (quoting *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).

Plaintiff argues that Defendants did not have probable cause to arrest him, because they did so without trustworthy information that he had committed the Bastarrica murder. (Pl.'s Opp'n at 25.)  The Court agrees.

### a. Search and Arrest Warrant Applications

On April 18, 1990, Inspector Crowley prepared and swore out an affidavit requesting a

search warrant for Plaintiff's residence, as well as a criminal complaint, and an affidavit in support of the issuance of a warrant for Plaintiff's arrest. (Crowley Decl. ¶¶ 64-65.)  On April 18, 1990, Municipal Court Judge Mary Morgan signed both the search warrant and the arrest warrant. (Case Chronology, Crowley Decl. ¶ 4, Ex. 2 at CCSF-CIRIA-000053; Search warrant with affidavit, Crowley Decl. ¶ 64, Ex. 50; Arrest warrant, Crowley Decl. ¶ 65, Ex. 51.)  At the hearing, when questioned about the absence of Crowley's sworn affidavit in support of the arrest warrant, Defendants explained that it was not included in the file and must have gotten lost.  On summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and make all justifiable inferences its favor. *Anderson,* 477 U.S. at 255.  Thus, since the "Chronological Report of Investigation" indicates that the warrants were prepared and sworn out together, and the affidavit was in Defendants' possession, the Court will justifiably infer that Crowley relied on the same probable cause statement in support of the arrest warrant as he did in support of the search warrant. (*See* Crowley Decl. ¶¶ 64-65; Case Chronology at CCSF-CIRIA-000053.)

Defendants' motion and oral argument focused on the "ample evidence" and "voluminous information that inspectors learned that implicated Plaintiff as Bastarrica's murderer," which they argue add up to probable cause. (*See* Defs.' Mot. at 24-25; Defs.' Reply at 2.)  This argument, however, is inconsistent with Ninth Circuit legal authority.  In fact, as Plaintiff argued at the hearing, the determination of whether a warrant was properly issued based on probable cause is limited to the facts contained in the warrant's affidavit. *See Butler v. Elle,* 281 F.3d 1014, 1020, 1023-24 (9th Cir. 2002) (only addressed facts in accompanying affidavit to determine existence of probable cause); *Ewing v. City of Stockton,* 588 F.3d 1218, 1223-24 (9th Cir. 2009) (probable cause analysis limited to affidavit).  Outside evidence not cited in the warrant cannot sustain the warrant. *Baldwin v. Placer Cnty.*, 418 F.3d 966, 971 (9th Cir. 2005) (citing *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983)).  Indeed, "[t]he fact that probable cause did exist and could have been established by a truthful affidavit does not cure the error." *United States v. Davis*, 714 F.2d at 899.

Again, since the arrest warrant affidavit is unavailable, the Court will infer that Crowley

16

cited the same facts as those in the affidavit in support of the concurrently issued, search warrant. Crowley's search warrant affidavit relied entirely on the Varela interview and only briefly mentioned Plaintiff's April 13, 1990 voluntary interview. (Affidavit, Crowley Decl. ¶ 64, Ex. 50 at CCSF-CIRIA 000257-258.)  As discussed above, the Court finds that the Varela interview could reasonably be found to have been coercive and, therefore, fabricated. *See* discussion, *supra,* Part III.C.i.  To sustain a warrant despite false or fabricated evidence, courts must purge false statements to determine whether the remaining facts justify the issuance of the warrant. *Ewing,* 588 F.3d at 1224 (citing *Baldwin,* 418 F.3d at 971).  Here, after removing the information elicited from the Varela interview, all that remained was that Plaintiff was interviewed with his attorney and identified Varela as an alibi witness. (Affidavit at CCSF-CIRIA 000257.)  This falls far short of what is required for a finding of probable cause to arrest, and it is sufficient to create a triable issue of fact as to whether there was probable cause to prosecute.

b. Other information purportedly known to Defendants

Despite the Ninth Circuit limiting the probable cause analysis to the face of the warrant, to the extent that Defendants argue that the challenged witness identifications effectively tied Plaintiff to the crime, the Court finds that the identification procedures employed by Crowley and Gerrans were suggestive and unreliable.  Guevara did not positively identify Plaintiff as the shooter through either the photo array or at the live lineup. On March 28, 1990, Guevara only said that Plaintiff's photo "looks the most like the suspect." (Crowley Decl. ¶ 36, Ex. 27.)  Then, on April 26, 1990, Guevara picked Plaintiff out of an in-person lineup with the caveat that she was only 80% sure because "she had seen this man's photo before." (Crowley Decl. ¶ 76, Ex. 66.)  Duff's identification is not better.  On April 5, 1990, Crowley and Gerrans showed Duff a photo array that included Ciria and Socorro, but Duff did not make an identification. (Crowley Decl. ¶ 41, Ex. 67.)  Crowley's notes indicate that Duff said that if he did make an identification, it would have to be in an "in-person, line-up situation." *Ids.*  Duff did not attend the in-person lineup, and did not make a positive identification of Plaintiff from a photo lineup until well after his arrest. (*See* Crowley Decl. ¶ 81.)

Moreover, much of the other cited evidence and witness interviews were not based on

United States District Court
Northern District of California

1    personal knowledge, and, instead, are more akin to gossip or rumor, which may not be relied upon

2    for a finding of probable cause. *See United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)

3    (citations and internal quotations omitted) ("[M]ere suspicion, common rumor, or even strong

4    reason to suspect are not enough" for probable cause.); *see also Henry v. United States,* 361 U.S.

5    98, 101, 80 S. Ct. 168, 170, 4 L. Ed. 2d 134 (1959) (same).

6         ii.    **Malice**

7         "[A] § 1983 malicious prosecution plaintiff must prove that the defendants acted for the

8    purpose of depriving him of a 'specific constitutional right.'" *Awabdy v. City of Adelanto*, 368

9    F.3d 1062, 1069 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th

10   Cir. 1995)). In opposition, Plaintiff contends that his evidence that Defendants fabricated evidence

11   is sufficient to satisfy this requirement, because there is a clearly established right to not be

12   subjected to criminal charges based on false evidence fabricated by the government. (Pl.'s Opp'n

13   at 27-28.)

14        Additionally, "malice is not limited to hostility or ill will, but encompasses improper

15   motive, which can be inferred from continued prosecution despite a lack of substantial grounds for

16   believing in plaintiff's guilt." *Trulove v. D'Amico*, No. 16-CV-050 YGR, 2018 WL 1070899, at *8

17   (N.D. Cal. Feb. 27, 2018) (citing *Greene v. Bank of Am.*, 216 Cal. App. 4th 454, 464–65 (2013).

18   The Court notes that Guevara, Duff, and the Medical Examiner testified at the preliminary hearing

19   on September 4, 1990. (Weiner Decl., Ex. E at 2, 89.)  Presumably, the eyewitness identification

20   by Guevara and Duff at the preliminary hearing were integral to the superior court's probable

21   cause finding, which held Plaintiff over to answer and proceed to criminal trial.  In the absence of

22   those identifications, it is unlikely that Plaintiff would have been made to stand trial.  Thus, a jury

23   could reasonably find that presenting these witnesses as credible, despite their failure to positively

24   identify Ciria, was intended to subject him to criminal charges based on false evidence. *See*

25   *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001).  This possibility is bolstered by

26   defense counsel's concession at the hearing that neither of these identifications were, in fact,

27   "positive" identifications.

28   //

United States District Court
Northern District of California

18

### iii.    Qualified Immunity

Defendants argue that even if Plaintiff could establish that the officers' conduct constituted malicious prosecution under § 1983, the officers are entitled to qualified immunity because it was "reasonably arguable that there was probable cause." (Defs.' Mot. at 20 (citing *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023).)

"Malicious prosecution, by itself, does not constitute a due process violation; to prevail [the plaintiff] must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). Plaintiff has the burden to identify the constitutional right he claims the officers sought to deprive him of, and to show that the right was clearly established at the time of the alleged misconduct.

As discussed above, Plaintiffs claims that Crowley and Gerrans caused him to be maliciously prosecuted for the purpose of depriving him of rights guaranteed under the Fourteenth Amendment, including the due process right not to be subjected to criminal charges on the basis of false evidence and the right to exculpatory evidence. Plaintiff cites to *Devereaux*, 263 F.3d 1070 at 1074–75, to argue that "[t]he right not to be subjected to criminal charges based deliberately fabricated false evidence is self-evident and long-established." (Pl.'s Opp'n at 28.) Plaintiff later cites to *Rubalcava v. City of San Jose,* No. 20-CV-04191-BLF, 2024 WL 1336456, at *21 (N.D. Cal. Mar. 27, 2024) and *Usher v. City of Los Angeles,* 828 F.2d 556, 562 (9th Cir. 1987) to argue that it was clearly established by 1990 "that a criminal defendant may bring a malicious prosecution claim against police officers who wrongfully caused his prosecution for the purpose of depriving him of a constitutional right." (Pl.'s Suppl. Br. at 3.)

Additionally, while not cited by Plaintiff, the Court notes that qualified immunity cannot act as a shield to judicial deception. *See Butler,* 281 F.3d at 1024. Generally,

> a plaintiff can only survive summary judgment on a defense claim of qualified immunity if the plaintiff can both establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant. Put another way, the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause.

*Hervey v. Estes,* 65 F.3d 784, 789 (9th Cir. 1995), as amended on denial of reh'g (Dec. 5, 1995).

In other words, since Plaintiff has made a substantial showing that Crowley's affidavit was based

on the Varela interview that, for the purposes of this motion, he and Gerrans coerced, and, if not

for that dishonesty, the warrant would not have issued, qualified immunity is unavailable. *See*

*Butler,* 281 F.3d at 1024 (citing *Hervey,* 65 F.3d at 788-89).

Based on these authorities, the Court finds that Defendants are not entitled to qualified

immunity with respect to the § 1983 claim for malicious prosecution.

### E.     § 1983 Conspiracy

The fourth cause of action is for conspiracy against the individual officers.  The elements

of a § 1983 claim for conspiracy are: "(1) the existence of an express or implied agreement among

the defendant officers to deprive [the plaintiff] of his constitutional rights, and (2) an actual

deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 596 F.3d 583, 592 (9th

Cir. 2010). "Whether defendants were involved in an unlawful conspiracy is generally a factual

issue and should be resolved by the jury, so long as there is a possibility that the jury can infer

from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached

a understanding to achieve the conspiracy's objectives." *Mendocino Env't Ctr. v. Mendocino Cty.*,

192 F.3d 1283, 1301-02 (9th Cir. 1999) (internal quotation marks and citation omitted). "To be

liable, each participant in the conspiracy need not know the exact details of the plan, but each

participant must at least share the common objective of the conspiracy." *Id*. at 1302 (internal

quotation marks and citation omitted).

Defendants argue that there is no evidence of the existence of a conspiracy and that

qualified immunity applies because intracorporate conspiracy does not clearly apply to § 1983

claims. (Defs.' Mot. at 32.)  In opposition, Plaintiff argues that there is sufficient evidence to

defeat summary judgment on the conspiracy claim. (Pl.'s Opp'n at 33.)  Specifically, Plaintiff

argues that Inspectors Gerrans and Crowley participated in improper conduct to target Plaintiff,

including by coercing key statements from Varela and failing to document exculpatory interviews

with witnesses at Galen's Bar. *Id.* at 34.

"The intracorporate conspiracy doctrine holds that 'a corporation or enterprise cannot

20

conspire with its agents acting within the scope of their employment.'" *Martinez v. City of Los Angeles*, No. 2:20-CV-10559-FWS-KS, 2023 WL 8686729, at *16 (C.D. Cal. Jan. 4, 2023) (quoting *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1325 (N.D. Cal. 1988)).  In an unpublished memorandum, the Ninth Circuit applied the intracorporate conspiracy doctrine to § 1983 cases and found that the district court erred in denying qualified immunity to the police detectives because the plaintiff "ha[d] not identified any case demonstrating that it was clearly established that the intracorporate-conspiracy doctrine [did] not apply in the context of a § 1983 conspiracy claim." *Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *2 (9th Cir. Oct. 11, 2023).  The Court finds this memorandum persuasive, and finds that Gerrans and Crowley are entitled to qualified immunity on the § 1983 conspiracy claim.

Accordingly, summary judgment is granted as to the fourth cause of action.

### F.    Municipal Liability (§ 1983)

Defendants contend that Plaintiff has failed to allege municipal liability under § 1983 by failing to identify a specific policy or training defect that was the moving force behind the constitutional violation. (Defs.' Mot. at 32-33.)

To impose municipal liability, the plaintiff must provide evidence that a specific policy or training defect was the "moving force" that caused that violation to occur. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Absent an official policy, a plaintiff must show the violation was caused by "a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotation marks omitted).

Here, Plaintiff purports to present deposition testimony and other evidence that the coercive interrogation techniques employed by Gerrans and Crowley were consistent with the training received from the SFPD. (Pl.'s Gerrans Dep. at 159:6-19, 161:11-163:8; Crowley Decl. ¶¶ 51-62.)  To the contrary, when asked if he followed his SFPD training, Gerrans appeared to make excuses for why his interrogation of Varela did not comply with that training. (*See* Pl.'s Gerrans Dep. at 160:1-161:2.)  Crowley's declaration similarly appears to make excuses for the tactics used instead of pointing to a specific policy or training. (*See* Crowley Decl. ¶¶ 51-62.)  Thus, the

1    Court finds that Plaintiff has failed to provide admissible evidence that any department policy,

2    custom or training would have allowed the inspectors to do what they are alleged to have done.

3        Accordingly, summary judgment is granted on the § 1983 *Monell* claims, such that the

4    only remaining claims against the City and County of San Francisco are the state law claims.

5        **G.    Remaining California Claims**

6            **i.    No probable cause to arrest**

7        First, Defendants argue that there was probable cause to arrest Plaintiff, which bars all state

8    law claims. (Defs.' Mot. at 33.)  As discussed above, a jury could find that there was no probable

9    cause to arrest Plaintiff, so this argument fails. *See* discussion, *supra,* Part III.D.i.

10           **ii.   Claims are not time-barred**

11       Defendants argue that Plaintiff's state law claims are time-barred, because they are

12   premised on his false imprisonment and pre-arraignment confinement in 1990. (Defs.' Mot. at 34.)

13   The Court disagrees.  California Government Code § 911.2 requires plaintiffs to present

14   government claims "not later than six months after the accrual of the cause of action." Cal. Gov't

15   Code § 911.2(a).  As Plaintiff argues in opposition, the Court previously addressed this issue in the

16   related case, and it found that claims related to Plaintiff's false imprisonment did not accrue until

17   his conviction was vacated in 2022. Order Granting in Part and Denying in Part Defs.' Mot. to

18   Dismiss, *Ciria et al. v. City and County of San Francisco,* No. 23-cv-02796-KAW (N.D. Cal. Feb.

19   22, 2024), ECF No. 35 at 10.  Indeed, "[i]t is settled that a cause of action for false imprisonment

20   accrues on the person's release from incarceration." *Torres v. Dep't of Corr. & Rehab.*, 217 Cal.

21   App. 4th 844, 848, 158 Cal. Rptr. 3d 876, 879 (2013) (citing *Scannell v. County of Riverside*, 152

22   Cal. App.3d 596, 606 (1984)).  Plaintiff was released from custody on April 20, 2022, and timely

23   filed a government claim.  Moreover, prior to Plaintiff's conviction being vacated, any claim

24   arising out of Plaintiff's arrest and prosecution would have been barred by *Heck v. Humphrey*, 512

25   U.S. 477 (1994).

26       Thus, Plaintiff's state law claims are not time-barred.

27           **iii.   Bane Act**

28       The fifth cause of action is violation of the Bane Act.  Under the Bane Act, a plaintiff can

United States District Court
Northern District of California

seek damages "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(b)-(c). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., threats, intimidation or coercion), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1125 (2016) (internal quotation marks and citation omitted).

Defendants argues that this claim is barred because all conduct was part of Plaintiff's prosecution. (Defs.' Mot. at 35.)  In opposition, Plaintiff argues that the Court has already resolved this issue when it limited his Bane Act damages to harms suffered prior to arraignment. (Pl.'s Opp'n at 35.)  Plaintiff is correct, and the Bane Act claim survives.

### iv.    State Law Conspiracy Claim

The sixth cause of action is conspiracy under California law.  Defendants argue that the state law conspiracy claims fails for the same reasons as the § 1983 claim. (Defs.' Mot. at 35.) Since summary judgment was granted as to the § 1983 conspiracy claim, summary judgment is granted as to the sixth cause of action.

### v.    Intentional Infliction of Emotional Distress

Defendants do not argue an independent grounds to grant summary judgment as to this cause of action, so this claim survives. (*See* Defs.' Mot. at 33-35.)

## H.    Punitive Damages

Finally, Defendants move for summary judgment on the prayer for punitive damages on the grounds that "[t]here is insufficient evidence to conclude the defendant officers were 'motivated by malice or indifference to' Plaintiff's federal rights, as required for punitive damages." (Defs.' Mot. at 35.)

"[A] jury may be permitted to assess punitive damages in an action under section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).  California law conditions punitive damages on the plaintiff proving "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).  If the jury believes Plaintiff's version of events, it could find that Crowley and Gerrans's conduct, at the very least, involved reckless or callous indifference.  Thus, the evidence in this case is sufficient to raise a triable issue as to the state of mind of Inspectors Crowley and Gerrans, and they are not entitled to summary judgment with respect to punitive damages.

## IV.    CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment. Summary judgment is granted as to the second, fourth, and sixth causes of action, as well as to all claims against Defendant Nicholas J. Rubino. Summary judgment is also granted as to the § 1983 claims against the City and County of San Francisco.  The motion is denied in all other respects.

IT IS SO ORDERED.

Dated: May 21, 2024

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California